# EXHIBIT A

STATE OF WISCONSIN             CIRCUIT COURT             DANE COUNTY
                                BRANCH __

---

**CDW DIRECT LLC,** an Illinois Limited Liability Company
200 North Milwaukee Avenue
Vernon Hills, Illinois 60061

**CDW LLC,** an Illinois Limited Liability Company
200 North Milwaukee Avenue
Vernon Hills, Illinois 60061

      Plaintiffs,

   vs.

**AMY PETERSON**
202 Bradley Farm Rd
Tomahawk, Wisconsin 54487

**ANN GARCIA**
18440 Oriental Oak Drive
Noblesville, Indiana 46062

**RICK DINKINS**
803 Pebble Brook Place
Noblesville, Indiana 46062

      Defendants.

Case No. _____  **10CV2144**
Case Code:  30704 (Other Injunction or
              Restraining Order)

*(stamp: CIRCUIT COURT / DANE COUNTY, WI / 10 APR 21 PM 4:19)*

---

**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

---

THIS IS AN AUTHENTICATED COPY OF THE ORIGINAL DOCUMENT FILED WITH THE DANE COUNTY CLERK OF CIRCUIT COURT.

CARLO ESQUEDA
CLERK OF CIRCUIT COURT

Plaintiffs CDW LLC, and CDW Direct (collectively "CDW"), for its cause of action against Defendants Richard Dinkins ("Dinkins"), Ann Garcia ("Garcia"), and Amy Peterson ("Peterson") (collectively "Defendants") state as follow:

### Preliminary Statement

1.      CDW employees Rick Dinkins, Ann Garcia and Amy Peterson are among several employees that recently resigned from CDW and joined CDW's competitor, NETech Corporation ("NETech").  For the last two months while still employed by CDW, Dinkins, Garcia, and Peterson engaged in a coordinated scheme to misappropriate CDW's confidential information and trade secrets and worked to divert business to and recruit CDW employees for NETech.  For example, at least a week before he resigned from CDW, Dinkins used a NETech email address to divert a CDW business opportunity to NETech.  While still employed by CDW, Dinkins also directed a significant amount of CDW confidential information and trade secrets to his personal email account, and he used that information improperly at NETech to solicit his former CDW customers both before and after he resigned from CDW.  Like Dinkins, Amy Peterson forwarded valuable spreadsheets containing confidential customer and sales information to her personal email account before she left CDW.  Ann Garcia also followed Dinkins' and Peterson's footsteps in sending CDW's confidential information to her personal email account in furtherance of her scheme to improperly solicit her CDW customers for NETech. Garcia also used multiple USB devices right before she resigned to improperly take CDW's trade secrets and confidential information.  While still employed by CDW, the Defendants also improperly solicited one another and other employees to leave CDW for NETech, and several other CDW employees subsequently have joined NETech.

2.      The Defendants' blatant misconduct violates their respective contractual confidentiality and nondisclosure obligations to CDW, as well as the Wisconsin Trade Secret Act

Wis. Stat. §134.90 and Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq.* Dinkins and Garcia also have violated their post-employment promises to not solicit CDW employees or the customers they worked with at CDW. In addition to claims under the Defendants' employment agreements, each of which contain a Dane County Circuit Court venue provision, the Defendants have violated their duty of loyalty to CDW, tortiously interfered with CDW's business relations and contracts, and conspired to commit harmful and wrongful acts. Dinkins and Garcia also have tortiously interfered with CDW's contract with Cisco, one of CDW's principal product suppliers. As a result of Defendants' improper conduct, CDW has suffered irreparable harm and has no adequate remedy at law unless Defendants' actions are quickly and decisively enjoined.

### The Parties

3.      CDW LLC is an Illinois Limited Liability Company that formerly was CDW Corporation, and its principal place of business in Vernon Hills, Illinois. CDW is a leading provider of technology solutions to businesses, educational and governmental institutions. CDW has more than 4,000 employees in 37 states.

4.      CDW Direct is a subsidiary of CDW LLC and is also an Illinois Limited Liability Company.

5.      Berbee Information Networks Corporation ("Berbee"), a Wisconsin corporation, was formerly Berbee Information Networks Corporation, a Delaware corporation. CDW LLC is a successor to Berbee, which is a subsidiary of CDW LLC as a result of a 2006 merger in which CDW paid $184 million in cash for Berbee.

6.      Peterson is an individual and a citizen of Tomahawk; Lincoln County, Wisconsin.

7.      Dinkins is an individual and a citizen of Noblesville; Hamilton County, Indiana

8.      Garcia is an individual and a citizen of Noblesville; Hamilton County, Indiana.

3

## General Allegations

9.     Berbee employed Dinkins and Garcia in its Indianapolis, Indiana office as advanced technology account executives.  After CDW acquired Berbee, both Dinkins and Garcia became CDW-Direct employees in its Indianapolis branch office and served as advanced technology account executives until they resigned on March 19 and 26, 2010, respectively.

10.     Berbee employed Peterson in Wausau, Wisconsin as an inside sales representative.  After CDW acquired Berbee, Peterson became a CDW-Direct employee in Wisconsin and served as an inside sales representative until she resigned on March 22, 2010.

11.     NETech Corporation ("NETech") is a Michigan corporation with an office located in Carmel, Indiana.  NETech designs and installs IP-based networks.  Like CDW, NETech sells Cisco technology products and solutions to businesses.

12.     Upon information and belief, Dinkins and Garcia are currently employed by NETech in its Carmel, Indiana office in sales capacities, and Peterson is currently employed by NETech in Wisconsin in an inside sales capacity.

## The Defendants' Employment Agreements

### Rick Dinkins

13.     On February 21, 2005, Dinkins executed an employment agreement ("Dinkins Agreement," attached hereto as Exhibit A).

14.     Pursuant to Paragraph C of the Dinkins Agreement, he acknowledged "that in connection with his or her employment, Employee will be given access to, generate and otherwise come in contact with Confidential Business Information of Berbee and customers of Berbee.  Employee understands that the improper disclosure or use of the Confidential Business Information could be highly detrimental and damaging to Berbee and/or its customers."

4

15.    Paragraph 4 of the Dinkins Agreement is entitled "Confidential Business Information and Nondisclosure." Confidential Business Information is defined in the Dinkins Agreement as:

a.    "all information of any kind relating to the business, operation and administration of Berbee, including, but not necessarily limited to, trade secrets, customer/client lists, financial information, policy or procedure manuals, computer software and systems, training programs and related materials, marketing materials and information, research results, information regarding corporate opportunities, the identity of clients or their business requirements, the identity of key contacts within the clients' organizations, and discoveries, inventions, ideas, concepts or product improvements, or compilations of any of the foregoing, or similar information provided to Berbee by customers of Berbee."

16.    Under Paragraph 4 of the Dinkins Agreement, Dinkins promised that he would not "disclose to others or use, both during his or her employment with Berbee or for a period of eighteen (18) months thereafter, except in the furtherance of the business of Berbee, any Confidential Business Information; provided, however, that Employee shall not disclose to others or use at any time after termination of his or her employment any Confidential Business Information that constitutes a trade secret under Section 134.90, Wis. Stats."

17.    Under Paragraph 6 of the Dinkins Agreement, he also promised "in any event, and regardless of whether Confidential Business Information is involved, Employee will not remove from the premises of Berbee, except in the pursuit of business of Berbee, any contracts, sales invoices, purchase orders, pricing information, technical information, component, device, record, computer program, tape or other document pertaining to the business of Berbee, whether developed by Employee or by someone else unless required in the course of employment or association with Berbee."

5

18.     In Paragraph 8 of the Dinkins Agreement, Dinkins agreed that for the twelve (12) month period following his termination for any reason, he would not engage in the following activities:

    (a)    soliciting or assisting in the solicitation of customers of Berbee;

    (b)    supplying goods or rendering services or assisting in such activities, to customers of Berbee;

    (c)    diverting or attempting to divert any customer's business from Berbee or otherwise interfering with the business relationships between Berbee and its customers;

    (d)    planning for or the organization of any business activity competitive with Berbee's business;

    (e)    combination or conspiration with other employees of Berbee for the purpose of acquisition of any such competitive business activity;

    (f)    actively soliciting for hire any employee of Berbee; or

    (g)    use or dissemination of Confidential Business Information, except in furtherance of the business interests of Berbee.

19.     Dinkins acknowledged and agreed that these restrictions "shall be enforceable with regard to any competitor with substantial business operations in the United States and with regard to any customer with whom the Employee has had direct contact during the twelve (12) months preceding termination, or any substantial customer of Berbee which exists at the time of the termination."

20.     Dinkins further agreed that the restrictive covenants in Paragraph 8 were "reasonably and properly necessary to adequately protect the legitimate business interests of Berbee, and that such restrictions will not prevent Employee from securing gainful employment using Employee's education, experience and know how in a non-competitive enterprise or activity."

**Ann Garcia**

21.    On October 6, 2003, Garcia executed an employment agreement ("Garcia Agreement," attached hereto as Exhibit B).

22.    Pursuant to Paragraph C of the Garcia Agreement, he acknowledged "that in connection with his or her employment, Employee will be given access to, generate and otherwise come in contact with Confidential Business Information of Berbee and customers of Berbee. Employee understands that the improper disclosure or use of the Confidential Business Information could be highly detrimental and damaging to Berbee and/or its customers."

23.    Paragraph 4 of the Garcia Agreement is entitled "Confidential Business Information and Nondisclosure." Confidential Business Information is defined in the Garcia Agreement as:

    a.    "all information of any kind relating to the business, operation and administration of Berbee, including, but not necessarily limited to, trade secrets, customer/client lists, financial information, policy or procedure manuals, computer software and systems, training programs and related materials, marketing materials and information, research results, information regarding corporate opportunities, the identity of clients or their business requirements, the identity of key contacts within the clients' organizations, and discoveries, inventions, ideas, concepts or product improvements, or compilations of any of the foregoing, or similar information provided to Berbee by customers of Berbee."

24.    Under Paragraph 4 of the Garcia Agreement, Garcia promised that she would not "disclose to others or use, both during his or her employment with Berbee or for a period of eighteen (18) months thereafter, except in the furtherance of the business of Berbee, any Confidential Business Information; provided, however, that Employee shall not disclose to others or use at any time after termination of his or her employment any Confidential Business Information that constitutes a trade secret under Section 134.90, Wis. Stats. …"

25.    Under Paragraph 6 of the Garcia Agreement, she also promised "in any event, and regardless of whether Confidential Business Information is involved, Employee will not remove from the premises of Berbee, except in the pursuit of business of Berbee, any contracts, sales invoices, purchase orders, pricing information, technical information, component, device, record, computer program, tape or other document pertaining to the business of Berbee, whether developed by Employee or by someone else unless required in the course of employment or association with Berbee."

26.    In Paragraph 8 of the Garcia Agreement, Garcia agreed that for the twelve (12) month period following her termination for any reason, she would not engage in the following activities:

(a)    soliciting or assisting in the solicitation of customers of Berbee;

(b)    supplying goods or rendering services or assisting in such activities, to customers of Berbee;

(c)    diverting or attempting to divert any customer's business from Berbee or otherwise interfering with the business relationships between Berbee and its customers;

(d)    planning for or the organization of any business activity competitive with Berbee's business;

(e)    combination or conspiration with other employees of Berbee for the purpose of acquisition of any such competitive business activity;

(f)    actively soliciting for hire any employee of Berbee; or

(g)    use or dissemination of Confidential Business Information, except in furtherance of the business interests of Berbee.

27.    Garcia acknowledged and agreed that these restrictions "shall be enforceable with regard to any competitor with substantial business operations in the United States and with regard to any customer with whom the Employee has had direct contact during the twelve (12)

months preceding termination, or any substantial customer of Berbee which exists at the time of the termination."

28.     Garcia further agreed that the restrictive covenants in Paragraph 8 were "reasonably and properly necessary to adequately protect the legitimate business interests of Berbee, and that such restrictions will not prevent Employee from securing gainful employment using Employee's education, experience and know how in a non-competitive enterprise or activity."

**Amy Peterson**

29.     On June 25, 2004, Peterson executed an employment agreement ("Peterson Agreement," attached hereto as Exhibit C).

30.     Pursuant to Paragraph C of the Peterson Agreement, she acknowledged "that in connection with his or her employment, Employee will be given access to, generate and otherwise come in contact with Confidential Business Information of Berbee and customers of Berbee. Employee understands that the improper disclosure or use of the Confidential Business Information could be highly detrimental and damaging to Berbee and/or its customers."

31.     Paragraph 4 of the Peterson Agreement is entitled "Confidential Business Information and Nondisclosure." "Confidential Business Information" is defined in the Peterson Agreement as:

  a.     "all information of any kind relating to the business, operation and administration of Berbee or a Predecessor Employer ..., including trade secrets, customer/client lists, financial information, policy or procedure manuals, computer software and data, training programs and related materials, marketing materials and information, research results, information regarding corporate opportunities, the identity of clients or their business requirements, the identity of key contacts within the clients' organizations, and discoveries, inventions, ideas, concepts or product improvements, or compilations of any of the foregoing, or similar information provided to Berbee or a Predecessor Employer by customers of Berbee or a Predecessor Employer."

9

32.    Under Paragraph 4 of the Peterson Agreement, she promised that she would not "disclose to others or use, both during his or her employment with Berbee or for a period of eighteen (18) months thereafter, except in the furtherance of the business of Berbee, any Confidential Business Information or trade secrets under Section 134.90, Wis. Stats. (the "Trade Secrets Act"), as amended, or other similar state or federal law."

33.    Peterson also promised in Paragraph 6 that she would "not remove from the premises of Berbee, except in the pursuit of business of Berbee, any contracts, sales invoices, purchase orders, pricing information, technical information, component, device, record, computer program, tape or other document pertaining to the business of Berbee, whether developed by Employee or by someone else unless required in the course of employment or association with Berbee."

**Other Provisions in the Employment Agreements**

34.    In each of the Agreements, Defendants agreed "that in the event of his or her breach of this Agreement, Berbee shall be entitled to both injunctive relief against the continued violation thereof and compensatory damages."

35.    The Peterson Agreement, Dinkins Agreement, and Garcia Agreement are "binding upon not only the parties, but their respective successors, assigns, heirs, legal representatives, executors and administrators, except that Employee may not assign or transfer any obligations or rights under this Agreement without the written consent of an officer of Berbee."

**CDW's Protection of Confidential Information and Trade Secrets**

36.    While employed by CDW, Dinkins, Garcia, and Peterson had regular and extensive access to the following confidential and trade secret information belonging to CDW:

10

a.   customer and prospective customer lists and information;

b.   partner information and pricing information;

c.   projects and prospective projects lists and information;

d.   pricing and margin strategies;

e.   shipping strategies;

f.   sales methods, strategies, and strategic partnerships;

g.   vendor and partner pricing and margin information;

h.   cost, pricing, and estimating information;

i.   growth strategies;

j.   current and historical financial performance; and

k.   the integration and aggregation of customer and prospective client information, project and prospective sales information, company pricing and estimating information, company strategies and methods, and company financial information.

37.    Under their employment agreements, Dinkins, Garcia, and Peterson agreed that it was their duty and obligation to preserve and protect CDW's Confidential Business Information during and after their employment.

38.    CDW developed its Confidential Business Information over a significant period of time and at great expense.  This information is not known outside of CDW and is valuable because of its secrecy.

39.    CDW protects its Confidential Business Information with levels of secrecy sufficient for CDW to derive economic value from its non-disclosure to other persons or entities who would obtain economic value from the disclosure of the Confidential Business Information. If competitors, such as NETech, obtained trade secrets and other confidential information, they would be able to unfairly bid against CDW who would then be deprived of the advantages from the secrecy of this information.

11

40.    CDW has protected the secrecy of its Confidential Business Information through several means, including but not limited to:  (a) requiring employees to sign agreements containing confidentiality provisions; (b) discussing confidentiality policies with its employees at the time of hire; (c) requiring key employees, such as Dinkins, Garcia, and Peterson, to sign post-employment restrictive covenants; (d) limiting access to confidential information and monitoring who is given access to such information; (e) password protecting all computers; (f) instructing personnel not to disclose confidential information to persons outside of CDW both during and after their employment; (g) prohibiting the disclosure of confidential information in employment policies; (h) requiring all confidentiality and proprietary materials to be returned whenever an employee terminates his or her employment; (i) requiring the execution of non-disclosure agreements prior to the distribution of relevant, limited information to it customers; (j) programming computer systems to lock automatically if they remain idle for more than a few minutes; (k) prohibiting the use of personal cameras at any time on CDW property; and (l) restricting employee access to corporate customers' account databases.

**Defendants' Access to Confidential Business Information and Trade Secrets**

41.    During the course of Defendants' employment with CDW, they were entrusted with and had access to a variety of Confidential Business Information, including product cost information, sales and margin information for each customer on each product, partner/vendor sales and margin information (such as Cisco), other cost information, customer sales histories, customer price quotes, purchasing manners and methods, the identity and addresses of actual or potential customers, supplier/vendor information, and financial data.  CDW invested millions of dollars in designing, developing, improving and protecting its Confidential Business Information.

12

42.     As account executives, Dinkins and Garcia managed all aspects of CDW's relationships with numerous customers and key partners like Cisco. In this capacity, Dinkins and Garcia developed pricing and margin strategies, implemented shipping strategies, negotiated sales, set prices, and had other responsibilities that required using Confidential Business Information. Because of their positions, Dinkins and Garcia were given access to corporate accounts, which contained Confidential Business Information, including product cost information and formulas, sales and margin data, partner pricing and margins information. This unique product cost information and formulas and margin information is extremely sensitive confidential information. CDW's competitors could use this information to CDW's disadvantage in bidding for work if they had access to it because it is not disclosed to customers and is not known to others who could benefit by using it. Moreover, Dinkins and Garcia were given access to the unique product cost formula and margin information for CDW's partners, such as Cisco, which also is extremely sensitive confidential information. In fact, Cisco and CDW require that each other maintain the confidentiality of the pricing and margin information. By virtue of their respective sales positions, Dinkins and Garcia were key employees at CDW.

43.     This customer and partner information cannot be acquired from customers or partners through general skills and knowledge. As an inside sales representative, Peterson supported Dinkins and Garcia in managing all aspects of CDW's relationships with their customers and partners such as Cisco. In this capacity, Peterson obtained information that Dinkins and Garcia received as described above and was also a key employee at CDW.

44.     Because the Defendants promised to protect and preserve Confidential Business Information, CDW entrusted Confidential Business Information to the Defendants with the explicit understanding that they would at all times keep it secret and use it only for the benefit of CDW.

**The Pre-Resignation Solicitations Among Dinkins, Garcia, Peterson and Directed At Other CDW Employees**

45.     Beginning at least by January 25, 2010, and continuing until the time of their resignations from CDW, Dinkins, Garcia and Peterson engaged in multiple verbal, email and instant message communications in which they solicited, encouraged and supported one another and other CDW employees to leave CDW and join NETech.  Subsequently, several other CDW employees joined NETech.

46.     On March 19, 2010, Dinkins resigned from CDW.  On March 22, 2010, Peterson resigned from CDW.  On March 26, 2010, Garcia resigned from CDW.

**Dinkins' Departure and Post-Termination Activities**

47.     Between at least March 8, 2010 through March 19, 2010, Dinkins sent several emails from his CDW email account to his personal email account (xxxxxxx@comcast.net), which contain Confidential Business Information and include emails and attachments with the following subject lines or attachments: (a) Wireless Project & Router; (b) Cisco quote; (c) Berbee Informacast; (d) Symmetry Medical - CSD.; (e) TCU Servers; (f) Q831286 Zimmer Serial Numbers Information; (g) Copy of Berbee SMARTnet; and (h) Wireless Project & Router; (i) SMARTnet Audit Steak n Shake; (j) Rick Dinkins - Community Hospital Orders - March.xls; (k) IP IVR License Issue; (l) Crowe Switches Price Quote; (m) CALC IPT City of Anderson Phase 2; (n) 3750 switches for Carlsbad Price Quote; (o) Redcats Part Two SOW; and (p) Zimmer Credit Request.

48.     In addition, on March 11, 2010, Dinkins used a flash drive he had never previously used at CDW.  Upon information and belief, Dinkins used this USB device to download CDW confidential information.

49.     Prior to forwarding this Confidential Business Information to his personal email account and while still employed by CDW, Dinkins obtained a NETech email address.

14

Specifically, on or before March 12, 2010, Dinkins registered rdinkins@netechcorp.com with CDW partner Cisco as his "primary email address." (Attached as Exhibit D).

50.     When Cisco learned of this later on March 12, 2010, one of Dinkins' contacts at Cisco, Scott Straub, wrote to alert Dinkins that his Cisco profile was "still tied to Rick at CDW!!" Dinkins then responded "Crap! When I was in the tool, it looked like things have changed." (Attached as Exhibit D).

51.     Upon information and belief, Dinkins diverted sales and/or sales opportunities to NETech while he was still employed by CDW.

52.     From March 15, 2010 through March 17, 2010, Dinkins submitted qualification approval requests to Cisco on behalf of NETech for CDW customer Redcats USA, L.P.

53.     Dinkins resigned without returning all Confidential Business Information and trade secrets in his possession, including but not limited to the emails and attachments he sent to his personal email account. Dinkins also used CDW's Confidential Business Information and trade secrets to negotiate preferred pricing for NETech with Cisco. Prior to and after his resignation, Dinkins has also purposefully interfered with CDW's relationship with its partners, including but not limited to Cisco.

54.     Dinkins continues to contact and solicit various customers with whom he had contact while employed by CDW to solicit their business on behalf of NETech, including but not limited to Redcats USA, Steak-N-Shake, and Biglari Holdings. In contacting and soliciting customers, Dinkins has used and disclosed to NETech and others the Confidential Business Information he surreptitiously sent to his personal email address. The customers Dinkins has solicited and contacted on behalf of NETech purchased tens of thousands of dollars in products and services from CDW in the last year.

55.     Both prior to and since his resignation, Dinkins has contacted and solicited other CDW employees on behalf of NETech in order to induce them to leave CDW. In fact, on the day she resigned, Peterson informed a Cisco employee that she was "going with Rick" to NETech and that he could expect to hear from them.

**Peterson's Departure and Post-Termination Activities**

56.     On March 21, 2010 and March 22, 2010, Peterson sent several emails from her CDW email account to her personal email account (xxxxxxxx@charter.net), which contain Confidential Business Information and include emails and attachments with the following subject lines: (a) Open Orders for Amy Peterson and (b) Community-2811 Router & 3560-24 Switch -Kleckner -ordered-PO 092868822-CDW Price Quote24199-1.

57.     Upon information and belief, on or before March 12, 2010, Peterson obtained a NETech email address prior to her resignation from CDW.

58.     Upon information and belief, Peterson diverted sales and/or sales opportunities to NETech, and assisted Dinkins and/or Garcia in doing so, while she was still employed by CDW.

59.     On March 22, 2010, Peterson resigned from CDW without returning all Confidential Business Information and trade secrets in her possession, including but not limited to the email and attachments she sent to her personal email account.

60.     Peterson continues to contact and assist Dinkins and Garcia in contacting and soliciting various customers with whom she had contact while employed by CDW to solicit their business on behalf on NETech. In contacting and soliciting these customers, Peterson has used and disclosed to NETech the Confidential Business Information she surreptitiously sent to her personal email address. The customers Peterson has solicited and contacted purchased tens of thousands of dollars in products and services from CDW in the last year.

**Garcia's Departure and Post-Termination Activities**

61.    In the two-day period prior to her resignation, Garcia used a removable flash drive and external hard drive.  Upon information and belief, Dinkins used these USB devices to download CDW information.

62.    In addition, on March 25, 2010, Garcia sent an email from her CDW email account to her personal email account (xxxxxxxx@comcast.net), with a spreadsheet titled "BlueLock-Nexus-CDW Price Quote."

63.    Garcia resigned from CDW without returning all Confidential Business Information and trade secrets in her possession, including but not limited to the email and attachments she sent to her personal email account and downloaded to the USB devices.  In addition, both before and after her resignation, Garcia disclosed this information to NETech and used this information to obtain better pricing from Cisco to enable her to solicit business from CDW customers on behalf of NETech.  Finally, Garcia also used CDW's Confidential Business Information and trade secrets to negotiate preferred pricing for NETech with Cisco.

64.    While still employed by CDW, Garcia diverted sales and/or sales opportunities of her CDW customers, including, but not limited to, Bridgestone-Firestone.  Since her resignation, Garcia continues to contact and solicit various customers with whom she had contact while employed by Berbee and CDW to solicit their business on behalf of NETech, including, but not limited to, Bridgestone-Firestone.  In contacting and soliciting these customers, Garcia has used and disclosed Confidential Business Information to NETech, including CDW's pricing arrangements with Cisco and sales margin information.  The customers Peterson has solicited and contacted purchased tens of thousands of dollars in products and services from Berbee and CDW in the last year.

65.    Prior to and after her resignation, Garcia has also purposefully interfered with CDW's relationship with its partner Cisco.

66.    Upon information and belief, Garcia has contacted and solicited other CDW and Berbee employees on behalf of NETech since her resignation.

### Count I-Violation of Wisconsin and Indiana Trade Secrets Act (All Defendants)

67.    CDW incorporates paragraphs 1-66, as if fully set forth here.

68.    Dinkins, Peterson, and Garcia each took and retained CDW's confidential and proprietary information.

69.    CDW takes reasonable steps to maintain the secrecy of the information taken.

70.    CDW derives value from the confidentiality of the information taken.

71.    The information taken by the Defendants comprises CDW's trade secrets because:

  a.    they constitute information that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

  b.    the information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

72.    The defendants misappropriated CDW's trade secrets, in violation of Wis. Stat. § 134.90(2) and Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq*.

73.    The Defendants have used and will inevitably further use or disclose CDW's trade secrets as employees of NETech.

74.    The Defendants' misappropriation was willful, malicious, and deliberate.

75.    As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law.  CDW is threatened with losing money, customers, employees, goodwill, confidential information, and income in amounts that may be difficult to determine,

18

unless the Defendants are enjoined and restrained by Order of this Court.  Further, the benefits of granting injunctive relief outweigh any possible injury.

### Count II—Breach of Contract - Confidentiality (All Defendants)

76.     CDW incorporates paragraphs 1-66, as if fully set forth here.

77.     The Dinkins Agreement, Peterson Agreement, and Garcia Agreement are all valid and enforceable contracts.

78.     The confidentiality provisions contained in the employment agreements are reasonable and reasonably necessary to protect CDW's legitimate protectable interests in prohibiting the exploitation or disclosure of this information.

79.     The Defendants disclosed CDW's Confidential Business Information to NETech and various CDW customers and partners without either the express or implied consent of CDW.

80.     The Defendants used CDW's Confidential Business Information for purposes outside the scope of their employment without either the express or implied consent of CDW

81.     The Defendants acted willfully and maliciously in wrongfully disclosing and using CDW's Confidential Business Information.

82.     Under their employment agreements, both during their employment and for a period of eighteen (18) months following their respective resignations, the Defendants have a duty (1) to keep confidential CDW's Confidential Business Information that the Defendants learned through their employment with CDW, and (ii) not to use, disclose, exploit, or divulge such Confidential Business Information other than for the benefit of CDW and with CDW's authorization.

83.     The Defendants have breached and threatened to continue to breach the confidentiality obligations in their employment agreements by (a) improperly disclosing and/or

using CDW's Confidential Business Information; and (b) failing to return CDW's Confidential Business Information.

84.     As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law.  CDW is threatened with losing money, customers, employees, goodwill, confidential information, and income in amounts that may be difficult to determine, unless the Defendants are enjoined and restrained by Order of this Court.   Further, the benefits of granting injunctive relief outweigh any possible injury

### Count III—Breach of Contract – Customer Solicitation (Dinkins and Garcia)

85.     CDW incorporates paragraphs 1-66, as if fully set forth here.

86.     The Dinkins Agreement and Garcia Agreement are valid and enforceable contracts.  The customer non-solicitation provisions contained in Paragraph 8 of the Dinkins Agreement and Garcia Agreement are reasonable and reasonably necessary to protect CDW's legitimate protectable interests in its confidential information and relationships with its customers.

87.     As salespeople, Dinkins and Garcia developed a special personal relationship with CDW's customers.  CDW invested in Dinkins and Garcia and provided a platform from which to foster, nurture, and cultivate their CDW customer contacts and relationships.

88.     Dinkins' and Garcia's employment positioned them to obtain specialized knowledge regarding the specific needs and wants of CDW's customers, CDW's pricing of products, CDW's costs, and the profit margins CDW earned on certain products.

89.     Dinkins and Garcia have breached the customer non-solicitation provisions in their employment agreements by (a) soliciting or assisting in the solicitation of former CDW customers who they had contact with during the twelve (12) month period preceding termination on behalf of NETech, and (b) supplying goods or rendering services to such customers.

90.    As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law.  CDW is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Dinkins and Garcia are enjoined and restrained by Order of this Court.  Further, the benefits of granting injunctive relief outweigh any possible injury.

### Count IV—Breach of Contract – Employee Solicitation (Dinkins and Garcia)

91.    CDW incorporates paragraphs 1-66, as if fully set forth here.

92.    The Dinkins Agreement and Garcia Agreement are valid and enforceable contracts.  The employee non-solicitation provisions contained in Paragraph 8 of Dinkins Agreement and the Garcia Agreement are reasonable and reasonably necessary to protect CDW's legitimate protectable interests in its confidential information and relationships with its employees.

93.    Dinkins and Garcia breached the employee non-solicitation provisions in their employment agreements by actively soliciting or assisting in the solicitation of one another, Peterson and other CDW employees.

94.    As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law.  CDW is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Dinkins and Garcia are enjoined and restrained by Order of this Court.  Further, the benefits of granting injunctive relief outweigh any possible injury.

### Count V - Breach of Duty of Loyalty (All Defendants)

95.    CDW incorporates paragraphs 1-66, as if fully set forth here.

96.    As employees of CDW, Defendants were key sales employees who had responsibilities such that they may be used to harm CDW.

21

97.    Defendants owed CDW a duty of loyalty.

98.    Defendants breached their duty of loyalty to CDW by, among other things, diverting and actively attempting to shift CDW business and sales opportunities to NETech, stealing and using Confidential Business Information on behalf of NETech, soliciting one another and other employees to leave CDW, and negotiating preferred pricing for NETech with Cisco, all while still employed by CDW.

99.    Defendants' breach of their duty of loyalty was willful and wanton toward the rights of CDW.

100.    As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law.  CDW is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Dinkins and Garcia are enjoined and restrained by Order of this Court.  Further, the benefits of granting injunctive relief outweigh any possible injury.

### Count VI-Tortious Interference with Contract (Garcia)

101.    CDW incorporates paragraphs 1-66, as if fully set forth here.

102.    Garcia knew of the CDW's partnership agreement with Cisco.

103.    Garcia intentionally and improperly interfered with the Cisco agreement by taking a Cisco deal she quoted for Firestone while at CDW with her to NETech.

104.    The interference was unjustified, and caused CDW to lose business.

105.    As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law.  CDW is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Garcia is enjoined and restrained by Order of this Court.  Further, the benefits of granting injunctive relief outweigh any possible injury.

### Count VII-Tortious Interference with Business Relationships (All Defendants)

106.    CDW incorporates paragraphs 1-66, as if fully set forth here.

107.    Defendants knew of the CDW's business relationships with its employees, partners and customers.

108.    Defendants intentionally and improperly interfered with these relationships.

109.    The interference was unjustified, and caused CDW to lose sales, profits and employees.

110.    As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law. CDW is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Dinkins and Garcia are enjoined and restrained by Order of this Court. Further, the benefits of granting injunctive relief outweigh any possible injury.

### Count VIII—Civil Conspiracy (All Defendants)

111.    CDW incorporates paragraphs 1-66, as if fully set forth here.

112.    The Defendants conspired together and otherwise acted in concert to misappropriate trade secrets and other confidential information belonging to CDW in contravention of Wis. Stat. § 134.90, and to violate their duties to CDW.

113.    The Defendants, in furtherance of their unlawful conspiracy, joined NETech for the purpose of using and exploiting trade secrets and other confidential information belonging to CDW, and to violate their duties to CDW.

114.    The Defendants will use and exploit CDW's trade secrets and other confidential information in competition with CDW.

115.    As a result, CDW has been injured, faces continued irreparable injury, and has no adequate remedy at law. CDW is threatened with losing money, customers, goodwill,

confidential information and income in amounts that may be difficult to determine, unless Defendants are enjoined and restrained by Order of this Court. Further, the benefits of granting injunctive relief outweigh any possible injury.

## Count IX—Request for Injunctive Relief (All Defendants)

116.    CDW incorporates paragraphs 1-66, as if fully set forth here.

117.    CDW has a well grounded fear that its statutory, contractual, and common law rights have been invaded and are in danger of immediate further invasion.

118.    Unless restrained from the use and disclosure of CDW's trade secrets and confidential information, the defendants will cause substantial harm to CDW that may be difficult to directly ascertain and measure.

119.    The balance of harm tips sharply in favor of CDW.

120.    Money damages would not be adequate to fully compensate CDW for the harm caused by the Defendants' violation of their employment agreements, misappropriation of CDW's trade secrets, and inevitable use and disclosure of CDW's trade secrets and confidential information.

121.    Under the employment agreements, the Wisconsin Trade Secrets Act, Wis. Stat. §134.90 Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq.*, and general equitable principles, CDW is entitled to injunctive relief against the Defendants enjoining them from using and disclosing CDW's trade secrets and confidential information.

122.    Under the Agreements, the Individual Defendants acknowledged CDW's right to specific performance and injunctive relief and the appropriateness of such relief.

24

## **Prayer for Relief**

For the foregoing reasons, Plaintiffs CDW LLC and Berbee Information Networks

Corporation respectfully requests that the Court:

a.    issue an injunction enjoining the defendants from using or disclosing CDW's trade secrets, confidential information, and intellectual property, and requiring the defendants to promptly return to CDW all materials that relate to any of CDW's trade secrets, confidential information, and intellectual property;

b.    issue an injunction enjoining the defendants from soliciting those customers with whom they worked with while at CDW on behalf of NETech for 12 months;

c.    issue an injunction enjoining the defendants for soliciting CDW employees for a period of 12 months;

d.    enter judgment for CDW and against the defendants in an amount sufficient to compensate CDW for its damages, plus punitive damages, with interest as allowed by law;

e.    grant an award of double damages and reasonable attorneys' fees under Wis. Stat. § 134.90(4)(b) and (c);

f.    assess all costs and fees to the defendants as provided by law; and

g.    grant such further relief as the Court deems just.

Dated this 21st day of April, 2010.

PERKINS COIE LLP

By: *Sarah C. Walkenhorst*

Sarah C. Walkenhorst, WI Bar No. 1041853
PERKINS COIE LLP
1 East Main Street, Suite 201
Madison, WI 53703-5118
608-663-7460 Telephone
608-633-7499 Facsimile
Swalkenhorst@perkinscoie.com

Craig T. Boggs*
Laurence J. Oleksa, WI Bar No. 1037981
PERKINS COIE LLP
131 S. Dearborn, Suite 1700
Chicago, IL 60603
312-324-8400 Telephone
312-324-9400 Facsimile
cboggs@perkinscoie.com
loleksa@perkinscoie.com

*pro hac vice application to be filed*

Attorneys for Plaintiffs CDW LLC and CDW Direct

## VERIFICATION

I, Christine Rother, do hereby affirm, under the penalties for perjury, that the facts alleged in the foregoing Verified Complaint for Injunctive and Other Relief are true to the best of my knowledge, information and belief.

Christine Rother
Senior Vice President, Sales
CDW LLC

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS AGREEMENT, made as of the _21_ day of _FEB_____, 2005, by and between **Berbee Information Networks Corporation**, a Delaware corporation ("Berbee"), and **Rick Dinkins** ("Employee").

## BACKGROUND

A.    Berbee is an international provider of sophisticated e-business solutions, including the design, marketing, sales, development, hosting and maintenance of Internet websites, particularly those with an electronic commerce component, and also offers a wide range of general technology development, consulting application service provisioning and networking services, including equipment resale to its customers.  Berbee's headquarters are located in Madison, Wisconsin, but the extent of its operations is growing each quarter, and that its business reach is both national and international.  As a result, Berbee seeks to identify, hire and retain the most qualified individuals to become employees, without regard to race, religion, color, age, gender, marital status, sexual orientation, disability, national origin or other protected status.

B.    Employee understands that by accepting employment with Berbee he or she will join part of a growing organization, will support Berbee and its goals, and willingly accepts the benefits and limitations that are contained in this Agreement.

C.    Employee acknowledges that in connection with his or her employment, Employee will be given access to, generate and otherwise come in contact with Confidential Business Information of Berbee and customers of Berbee.  Employee understands that the improper disclosure or use of the Confidential Business Information could be highly detrimental and damaging to Berbee and/or its customers.

D.    Berbee has offered Employee employment for compensation and other benefits set forth in this Agreement, and Employee is willing to accept employment on such terms.

## AGREEMENT

THEREFORE, Employee and Berbee agree as follows:

1.    **Employment; Duties**.  Berbee will employ Employee as an Account Manager. Employee will have primary responsibility for achieving maximum sales profitability and growth in assigned territory by effectively selling the company's products and related services. While employed by Berbee, Employee will devote his or her best efforts and such time, skill, labor and attention as is necessary to advance the interests of Berbee and will not engage in or be concerned with any other commercial duties or pursuits which would detract from his or her ability to perform his or her employment duties on a full-time, best-efforts basis.

2.    **Term**.  Berbee and Employee anticipate a mutually beneficial relationship that may continue indefinitely, but explicitly recognize that Employee is employed on an "at will" basis.  This Agreement may be terminated, with or without cause, by either party upon the giving of written notice to the non-terminating party.  It is

expected that a reasonable period of notice under the relevant circumstances will be provided.

3. **Compensation; Fringe Benefits/Reimbursement.** During the term of this Agreement, Berbee shall provide Employee with the following:

   a. **Base Salary.** Berbee will pay Employee a starting base annual salary of $65,000, subject to review and adjustment upon a periodic basis by Berbee.

   b. **Bonus Plan.** You will be eligible for the 2005 Account Manager Compensation Plan.

   c. **Fringe Benefits.** The Employee will be entitled to participate in all fringe benefit programs offered by Berbee to its employees, including various kinds of insurance, retirement plans and paid vacation, as further described in the Berbee welfare and benefit plans and the employee personnel manual. Employee shall be entitled at their hire date to (15) Fifteen days paid vacation annually prorated for any partial calendar year and part time employment. Any vacation unused in any calendar year shall not carryover to any subsequent year. Employee shall notify Corporation at least ten (10) days prior to any scheduled vacation.

   d. **Equipment.** Berbee will provide Employee with such supplies, materials and equipment as Berbee considers appropriate to assist Employee with carrying out his or her duties. All such supplies, materials and equipment will remain the sole and exclusive property of Berbee and upon the termination of this Agreement, for whatever reason, shall be promptly returned by Employee to Berbee.

4. **Confidential Business Information and Nondisclosure.** It is understood that Employee has and will acquire and be informed of Confidential Business Information during his or her employment with Berbee. "Confidential Business Information" means all information of any kind relating to the business, operation and administration of Berbee, including, but not necessarily limited to, trade secrets, customer/client lists, financial information, policy or procedure manuals, computer software and systems, training programs and related materials, marketing materials and information, research results, information regarding corporate opportunities, the identity of clients or their business requirements, the identity of key contacts within the clients' organizations, and discoveries, inventions, ideas, concepts or product improvements, or compilations of any of the foregoing, or similar information provided to Berbee by customers of Berbee.

Employee acknowledges and agrees that (i) the Confidential Business Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) the Confidential Business Information is, and has been, subject to efforts by Berbee to

-2-

maintain its secrecy that are reasonable under the circumstances. Confidential Business Information does not include information concerning Berbee and its business which is widely disclosed to the public in published form, nor does it include generally available information concerning principles of business operations.

Employee shall not disclose to others or use, both during his or her employment with Berbee or for a period of eighteen (18) months thereafter, except in the furtherance of the business of Berbee, any Confidential Business Information; provided, however, that Employee shall not disclose to others or use at any time after termination of his or her employment any Confidential Business Information that constitutes a trade secret under Section 134.90, Wis. Stats. (the "Trade Secrets Act"), as amended.

5.    **Duties to Prior Employers.**  Berbee does not request, nor would it allow employee to disclose trade secrets or appropriately protected intellectual property of the Employee's former employer, and Employee agrees not to provide Berbee with any such trade secrets or intellectual property owned by any previous employer of Employee.

6.    **Removal of Materials.**  In any event, and regardless of whether Confidential Business Information is involved, Employee will not remove from the premises of Berbee, except in the pursuit of business of Berbee, any contracts, sales invoices, purchase orders, pricing information, technical information, component, device, record, computer program, tape or other document pertaining to the business of Berbee, whether developed by Employee or by someone else unless required in the course of employment or association with Berbee.

7.    **Delivery of Materials to Berbee.**  Immediately upon termination of his or her employment with Berbee, Employee will return to the principal office of Berbee all written, recorded and graphical materials, documents and items (and copies thereof) in his or her possession or under his or her control and related to the business of Berbee, regardless of whether such materials, documents and items contain Confidential Business Information.

8.    **Covenant Not To Compete.**  As a result of Employee's experience in the business of Berbee, the training given to Employee by Berbee the substantial investment Berbee has made in time, effort and expense to develop products and services, establish customer relationships, and the fact that he or she will have access to Confidential Business Information (as defined above) relating to Berbee while in the employ of Berbee, the parties acknowledge and agree that if Employee competed with Berbee, either directly or indirectly, such competition would have a significant negative impact on Berbee's business and financial condition. Accordingly, Employee agrees that while employed by Berbee and for a period of equal to his or her length of employment, but not greater than twelve (12) months from the termination of this Agreement for whatever reason, he or she shall not directly or indirectly, whether as an owner, stockholder, partner, employee, consultant, agent, independent contractor or otherwise, for himself or

-3-

herself, or on behalf of any other person or entity, engaged directly or indirectly, or enter into any aspect of the business of Berbee (as such business activities exist as of the date of his or her termination of employment).

The forms of competition prohibited by this paragraph shall include, but not be limited to, the following activities to the extent that any of them are competitive with the business of Berbee: (a) soliciting or assisting in the solicitation of customers of Berbee; (b) supplying goods or rendering services or assisting in such activities, to customers of Berbee; (c) diverting or attempting to divert any customer's business from Berbee or otherwise interfering with the business relationships between Berbee and its customers; (d) planning for or the organization of any business activity competitive with Berbee's business; (e) combination or conspiration with other employees of Berbee for the purpose of acquisition of any such competitive business activity; (f) actively soliciting for hire any employee of Berbee; or (g) use or dissemination of Confidential Business Information, except in furtherance of the business interests of Berbee (subject to the provisions of paragraph 4 hereof).

The foregoing prohibition shall not be interpreted to prevent or limit the right of Employee to invest in the capital stock or other securities of any corporation whose stock or other securities are publicly owned and are regularly traded on any public securities exchange, so long as such interest does not exceed 3% of the equity of such company.

This covenant not to compete shall be enforceable with regard to any competitor with substantial business operations in the United States and with regard to any customer with whom the Employee has had direct contact during the twelve (12) months preceding termination, or any substantial customer of Berbee which exists at the time of the termination. Berbee may provide a list of such competitors and customers to Employee within seven (7) days of the termination date, but such non-competition restrictions shall not be solely restricted to such listed competitors or customers, but such restrictions shall be reasonably enforced to protect the interest of Berbee.

Employee agrees that the covenants above are reasonably and properly necessary to adequately protect the legitimate business interests of Berbee, and that such restrictions will not prevent Employee from securing gainful employment using Employee's education, experience and know how in a non-competitive enterprise or activity. In the event that any one or more of such time or other limitations is found to be unreasonable by a court of competent jurisdiction, Employee agrees and submits to the reduction of said time and other limitation to such an area, scope period or otherwise as the court may determine to be reasonable. In the event that any limitation in this Agreement is found to be unreasonable or otherwise invalid in any jurisdiction, in whole or in part, Employee hereby acknowledges, warrants and agrees that such limitation shall remain and be valid in all other jurisdictions.

9.  **Injunctive Relief.**  Employee acknowledges that damages for the breach of this Agreement related to disclosure of Confidential Business Information or improper competition will be inadequate and will not give full and sufficient relief to Berbee, and that a breach of any provision of this Agreement will constitute irreparable harm to Berbee.  Therefore, Employee agrees that in the event of his or her breach of this Agreement, Berbee shall be entitled to both injunctive relief against the continued violation thereof and compensatory damages.

10. **Absence of Conflicts.**  Employee represents that there is no agreement with any other party which would conflict with his or her duties or obligations under this Agreement.

11. **Auto Insurance.**  Employee agrees to acquire and maintain liability insurance covering Employee when Employee's personal vehicle is used for work-related travel.  Work-related travel includes, but is not limited to, commuting to and from client sites.

12. **Inventions.**  Employee shall disclose promptly to Berbee any and all significant conceptions and ideas for inventions, improvements and valuable discoveries, whether patentable or not, which are conceived or made by Employee, solely or jointly with another, during the period of Employee's employment or within one (1) year thereafter, and which are directly related to the business or activities of Berbee or which Employee conceives as a result of Employee's employment by Berbee.  Employee hereby assigns and agrees to assign all Employee's interests therein to Berbee or its nominee.  Whenever requested to do so by Berbee, shall deem necessary to apply for and obtain Letters of Patent of the United States or any foreign country or to otherwise protect Berbee's interest therein.

13. **Miscellaneous.**

    a.  **Successors.**  This Agreement shall be binding upon not only the parties, but their respective successors, assigns, heirs, legal representatives, executors and administrators, except that Employee may not assign or transfer any obligations or rights under this Agreement without the written consent of an officer of Berbee.

    b.  **Modification, Amendment or Waiver.**  No modification, amendment or waiver of any provision of this Agreement shall be effective unless approved in writing by both parties.  The failure of either party at any time to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of any such provisions and shall not effect the right of either party thereafter to enforce each and every provision thereof in accordance with its terms.

    c.  **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be

ineffective only to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement.

d. **No Strict Construction.** The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall apply against either party.

e. **Governing Law; Venue.** All questions concerning the construction, validity and interpretation of this Agreement shall be governed by the laws of the State of Wisconsin. The venue for any legal proceedings concerning this Agreement shall be Dane County Circuit Court, Madison, Wisconsin.

f. **Survival.** The provisions and covenants of paragraphs 4, 7, and 8 shall survive the termination of this agreement.

g. **Consultation with Attorney.** Employee acknowledges that prior to signing this Agreement, Employee had the opportunity to consult with an attorney of his choice concerning the terms and conditions of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first indicated above.

**BERBEE INFORMATION NETWORKS CORPORATION**

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Diane C. Rivers, Director, People Department

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Rick Dinkins, individually

-6-

# EXHIBIT B

# EMPLOYMENT AGREEMENT

THIS AGREEMENT, made as of the _6th_ day of _October_, 2003, by and between **Berbee Information Networks Corporation**, a Delaware corporation ("Berbee"), and **Ann C.C. Garcia** ("Employee").

## BACKGROUND

A.    Berbee is an international provider of sophisticated e-business solutions, including the design, marketing, sales, development, hosting and maintenance of Internet websites, particularly those with an electronic commerce component, and also offers a wide range of general technology development, consulting application service provisioning and networking services, including equipment resale to its customers. Berbee's headquarters are located in Madison, Wisconsin, but the extent of its operations is growing each quarter, and that its business reach is both national and international. As a result, Berbee seeks to identify, hire and retain the most qualified individuals to become employees, without regard to race, religion, color, age, gender, marital status, sexual orientation, disability, national origin or other protected status.

B.    Employee understands that by accepting employment with Berbee he or she will join part of a growing organization, will support Berbee and its goals, and willingly accepts the benefits and limitations that are contained in this Agreement.

C.    Employee acknowledges that in connection with his or her employment, Employee will be given access to, generate and otherwise come in contact with Confidential Business Information of Berbee and customers of Berbee. Employee understands that the improper disclosure or use of the Confidential Business Information could be highly detrimental and damaging to Berbee and/or its customers.

D.    Berbee has offered Employee employment for compensation and other benefits set forth in this Agreement, and Employee is willing to accept employment on such terms.

## AGREEMENT

THEREFORE, Employee and Berbee agree as follows:

1.    **Employment; Duties.** Berbee will employ Employee as an Account Manager. Employee will have primary responsibility for achieving maximum sales profitability and growth in assigned territory by effectively selling the company's products and related services. While employed by Berbee, Employee will devote his or her best efforts and such time, skill, labor and attention as is necessary to advance the interests of Berbee and will not engage in or be concerned with any other commercial duties or pursuits which would detract from his or her ability to perform his or her employment duties on a full-time, best-efforts basis.

2.    **Term.** Berbee and Employee anticipate a mutually beneficial relationship that may continue indefinitely, but explicitly recognize that Employee is employed on an "at will" basis. This Agreement may be terminated, with or without cause, by either party upon the giving of written notice to the non-terminating party. It is

expected that a reasonable period of notice under the relevant circumstances will be provided.

3. **Compensation; Fringe Benefits/Reimbursement.** During the term of this Agreement, Berbee shall provide Employee with the following:

    a. **Base Salary.** Berbee will pay Employee a starting base annual salary of $65,000, subject to review and adjustment upon a periodic basis by Berbee.

    b. **Sign on Bonus.** Berbee will pay employee a one time sign on bonus of $5,000 minus applicable taxes to be paid on first payroll.

    c. **Sales Commission Plan.** You will be eligible for the 2003 commission schedule attached to your employment agreement.

    d. **Draw.** You will be guaranteed a $5,000 per month draw against commissions for the first 4 (four) months of your employment based on a November 1, 2003 start date. You will be guaranteed a $3,000 per month draw against commissions for the remaining 10 (ten) months of 2004. Terms of draw are further defined in the compensation plan attached to your employment agreement.

    e. **Fringe Benefits.** The Employee will be entitled to participate in all fringe benefit programs offered by Berbee to its employees, including various kinds of insurance, retirement plans and paid vacation, as further described in the Berbee welfare and benefit plans and the employee personnel manual. Employee shall be entitled at their hire date to (15) Fifteen days paid vacation annually prorated for any partial calendar year and part time employment. Any vacation unused in any calendar year shall not carryover to any subsequent year. Employee shall notify Corporation at least ten (10) days prior to any scheduled vacation.

    f. **Equipment.** Berbee will provide Employee with such supplies, materials and equipment as Berbee considers appropriate to assist Employee with carrying out his or her duties. All such supplies, materials and equipment will remain the sole and exclusive property of Berbee and upon the termination of this Agreement, for whatever reason, shall be promptly returned by Employee to Berbee.

4. **Confidential Business Information and Nondisclosure.** It is understood that Employee has and will acquire and be informed of Confidential Business Information during his or her employment with Berbee. "Confidential Business Information" means all information of any kind relating to the business, operation and administration of Berbee, including, but not necessarily limited to, trade secrets, customer/client lists, financial information, policy or procedure manuals, computer software and systems, training programs and related materials, marketing materials and information, research results, information regarding

-2-

corporate opportunities, the identity of clients or their business requirements, the identity of key contacts within the clients' organizations, and discoveries, inventions, ideas, concepts or product improvements, or compilations of any of the foregoing, or similar information provided to Berbee by customers of Berbee.

Employee acknowledges and agrees that (i) the Confidential Business Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) the Confidential Business Information is, and has been, subject to efforts by Berbee to maintain its secrecy that are reasonable under the circumstances. Confidential Business Information does not include information concerning Berbee and its business which is widely disclosed to the public in published form, nor does it include generally available information concerning principles of business operations.

Employee shall not disclose to others or use, both during his or her employment with Berbee or for a period of eighteen (18) months thereafter, except in the furtherance of the business of Berbee, any Confidential Business Information; provided, however, that Employee shall not disclose to others or use at any time after termination of his or her employment any Confidential Business Information that constitutes a trade secret under Section 134.90, Wis. Stats. (the "Trade Secrets Act"), as amended.

5.    **Duties to Prior Employers.**  Berbee does not request, nor would it allow employee to disclose trade secrets or appropriately protected intellectual property of the Employee's former employer, and Employee agrees not to provide Berbee with any such trade secrets or intellectual property owned by any previous employer of Employee.

6.    **Removal of Materials.**  In any event, and regardless of whether Confidential Business Information is involved, Employee will not remove from the premises of Berbee, except in the pursuit of business of Berbee, any contracts, sales invoices, purchase orders, pricing information, technical information, component, device, record, computer program, tape or other document pertaining to the business of Berbee, whether developed by Employee or by someone else unless required in the course of employment or association with Berbee.

7.    **Delivery of Materials to Berbee.**  Immediately upon termination of his or her employment with Berbee, Employee will return to the principal office of Berbee all written, recorded and graphical materials, documents and items (and copies thereof) in his or her possession or under his or her control and related to the business of Berbee, regardless of whether such materials, documents and items contain Confidential Business Information.

8.    **Covenant Not To Compete.**  As a result of Employee's experience in the business of Berbee, the training given to Employee by Berbee the substantial investment Berbee has made in time, effort and expense to develop products and

-3-

services, establish customer relationships, and the fact that he or she will have access to Confidential Business Information (as defined above) relating to Berbee while in the employ of Berbee, the parties acknowledge and agree that if Employee competed with Berbee, either directly or indirectly, such competition would have a significant negative impact on Berbee's business and financial condition. Accordingly, Employee agrees that while employed by Berbee and for a period of equal to his or her length of employment, but not greater than twelve (12) months from the termination of this Agreement for whatever reason, he or she shall not directly or indirectly, whether as an owner, stockholder, partner, employee, consultant, agent, independent contractor or otherwise, for himself or herself, or on behalf of any other person or entity, engaged directly or indirectly, or enter into any aspect of the business of Berbee (as such business activities exist as of the date of his or her termination of employment).

The forms of competition prohibited by this paragraph shall include, but not be limited to, the following activities to the extent that any of them are competitive with the business of Berbee: (a) soliciting or assisting in the solicitation of customers of Berbee; (b) supplying goods or rendering services or assisting in such activities, to customers of Berbee; (c) diverting or attempting to divert any customer's business from Berbee or otherwise interfering with the business relationships between Berbee and its customers; (d) planning for or the organization of any business activity competitive with Berbee's business; (e) combination or conspiration with other employees of Berbee for the purpose of acquisition of any such competitive business activity; (f) actively soliciting for hire any employee of Berbee; or (g) use or dissemination of Confidential Business Information, except in furtherance of the business interests of Berbee (subject to the provisions of paragraph 4 hereof).

The foregoing prohibition shall not be interpreted to prevent or limit the right of Employee to invest in the capital stock or other securities of any corporation whose stock or other securities are publicly owned and are regularly traded on any public securities exchange, so long as such interest does not exceed 3% of the equity of such company.

This covenant not to compete shall be enforceable with regard to any competitor with substantial business operations in the United States and with regard to any customer with whom the Employee has had direct contact during the twelve (12) months preceding termination, or any substantial customer of Berbee which exists at the time of the termination. Berbee may provide a list of such competitors and customers to Employee within seven (7) days of the termination date, but such non-competition restrictions shall not be solely restricted to such listed competitors or customers, but such restrictions shall be reasonably enforced to protect the interest of Berbee.

Employee agrees that the covenants above are reasonably and properly necessary to adequately protect the legitimate business interests of Berbee, and that such restrictions will not prevent Employee from securing gainful employment using Employee's education, experience and know how in a non-competitive enterprise

-4-

or activity. In the event that any one or more of such time or other limitations is found to be unreasonable by a court of competent jurisdiction, Employee agrees and submits to the reduction of said time and other limitation to such an area, scope period or otherwise as the court may determine to be reasonable. In the event that any limitation in this Agreement is found to be unreasonable or otherwise invalid in any jurisdiction, in whole or in part, Employee hereby acknowledges, warrants and agrees that such limitation shall remain and be valid in all other jurisdictions.

9. **Injunctive Relief**. Employee acknowledges that damages for the breach of this Agreement related to disclosure of Confidential Business Information or improper competition will be inadequate and will not give full and sufficient relief to Berbee, and that a breach of any provision of this Agreement will constitute irreparable harm to Berbee. Therefore, Employee agrees that in the event of his or her breach of this Agreement, Berbee shall be entitled to both injunctive relief against the continued violation thereof and compensatory damages.

10. **Absence of Conflicts**. Employee represents that there is no agreement with any other party which would conflict with his or her duties or obligations under this Agreement.

11. **Auto Insurance.** Employee agrees to acquire and maintain liability insurance covering Employee when Employee's personal vehicle is used for work-related travel. Work-related travel includes, but is not limited to, commuting to and from client sites.

12. **Inventions**. Employee shall disclose promptly to Berbee any and all significant conceptions and ideas for inventions, improvements and valuable discoveries, whether patentable or not, which are conceived or made by Employee, solely or jointly with another, during the period of Employee's employment or within one (1) year thereafter, and which are directly related to the business or activities of Berbee or which Employee conceives as a result of Employee's employment by Berbee. Employee hereby assigns and agrees to assign all Employee's interests therein to Berbee or its nominee. Whenever requested to do so by Berbee, shall deem necessary to apply for and obtain Letters of Patent of the United States or any foreign country or to otherwise protect Berbee's interest therein.

13. **Miscellaneous**.

   a. **Successors**. This Agreement shall be binding upon not only the parties, but their respective successors, assigns, heirs, legal representatives, executors and administrators, except that Employee may not assign or transfer any obligations or rights under this Agreement without the written consent of an officer of Berbee.

   b. **Modification, Amendment or Waiver**. No modification, amendment or waiver of any provision of this Agreement shall be effective unless approved in writing by both parties. The failure of either party at any time to enforce any of the provisions of this Agreement shall in no way be

construed as a waiver of any such provisions and shall not effect the right of either party thereafter to enforce each and every provision thereof in accordance with its terms.

c.    **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement.

d.    **No Strict Construction.**  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall apply against either party.

e.    **Governing Law; Venue.**  All questions concerning the construction, validity and interpretation of this Agreement shall be governed by the laws of the State of Wisconsin.    The venue for any legal proceedings concerning this Agreement shall be Dane County Circuit Court, Madison, Wisconsin.

f.    **Survival.**  The provisions and covenants of paragraphs 4, 7, and 8 shall survive the termination of this agreement.

g.    **Consultation with Attorney.**  Employee acknowledges that prior to signing this Agreement, Employee had the opportunity to consult with an attorney of his choice concerning the terms and conditions of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first indicated above.

**BERBEE INFORMATION NETWORKS CORPORATION**

By: _____

    Diane C. Rivers, Director, People Department

By: _____

    Ann C.C. Garcia, individually

# EXHIBIT C

# EMPLOYMENT AGREEMENT

THIS AGREEMENT, made as of the $25$ day of June, 2004, by and between **Berbee Information Networks Corporation**, a Delaware corporation ("Berbee" or "Company"), and **Amy Peterson** ("Employee"). For purposes of this agreement, "Berbee" is defined to include the predecessor company, Network Engineering Associates ("NEA").

## BACKGROUND

A.     Berbee is a provider of information technology services and solutions, including the design, build, and management of computer systems, applications, and infrastructure either on premise at the customer or in a Berbee data center. Berbee's headquarters are located in Madison, Wisconsin, and the company has a national reach in delivering its products and services. As a result, Berbee seeks to identify, hire and retain the most qualified individuals to become employees, without regard to race, religion, color, age, gender, marital status, sexual orientation, disability, national origin or other protected status.

B.     Employee understands that by accepting employment with Berbee he or she will join part of a growing organization, will support Berbee and its goals, and willingly accepts the benefits and limitations that are contained in this Agreement.

C.     Employee acknowledges that in connection with his or her employment, Employee will be given access to, generate and otherwise come in contact with Confidential Business Information of Berbee and customers of Berbee. Employee understands that the improper disclosure or use of the Confidential Business Information could be highly detrimental and damaging to Berbee and/or its customers.

D.     Berbee has offered Employee employment for compensation and other benefits set forth in this Agreement, and Employee is willing to accept employment on such terms.

## AGREEMENT

THEREFORE, Employee and Berbee agree as follows:

1. **Employment; Duties**.  Berbee will employ Employee in the same position that Employee was last employed by Network Engineering Associates ("NEA"). While employed by Berbee, Employee will devote his or her best efforts and full time necessary to advance the interests of Berbee and will not engage in any other commercial duties or pursuits which would detract from his or her ability to perform stated duties.

2. **Term**.  Berbee and Employee anticipate a mutually beneficial relationship that may continue indefinitely, but explicitly recognize that Employee is employed on an "at will" basis. This Agreement may be terminated, with or without cause, by either party upon the giving of written notice to the non-terminating party. It is expected that a reasonable period of notice under the relevant circumstances will be provided.

3. **Compensation; Fringe Benefits/Reimbursement**.  During the term of this Agreement, Berbee shall provide Employee with the following:

a.  **Base Salary.**  Berbee shall pay Employee a base annual salary equal to his or her NEA annual salary on the Last Day of NEA Employment.

b.  **Incentive Compensation.**  Employee will continue to be eligible for incentive compensation under terms similar to those in place for NEA for the remainder of 2004.  Berbee, or the predecessor company, retain the right to make modifications to compensation plans in the future to more closely match those plans in place for existing Berbee employees.

c.  **Fringe Benefits.**  Employee shall be eligible to participate in all benefit plans provided by Berbee to eligible employees, including various kinds of insurance, retirement plans and paid vacation, as further described in the Berbee welfare and benefit plans and the employee personnel manual.  During the initial period of transition, the provider of specific benefit programs may be either that of the predecessor company, or Berbee.  Over time, Berbee will move all employees to common plans.

Employee shall be allowed to participate in Berbee's paid vacation policy.  Employee shall be entitled to at least the same amount of annual paid vacation time that he or she was receiving from NEA on the last day of NEA employment.  Vacation shall be annually prorated for any partial calendar year and part time employment.  Any vacation unused in any calendar year shall not carryover to any subsequent year.  Employee shall notify Berbee at least ten (10) days prior to any scheduled vacation.

d.  **Equipment.**  Berbee (or predecessor company) will provide Employee with such supplies, materials and equipment necessary to assist Employee with carrying out his or her duties.  All such supplies, materials and equipment will remain the property of Berbee and upon the termination of this Agreement shall be returned by Employee to Berbee.

4.  **Confidential Business Information and Nondisclosure.**  It is understood that Employee will acquire and be informed of Confidential Business Information during his or her employment with Berbee.  "Confidential Business Information" means all information of any kind relating to the business, operation and administration of Berbee or a Predecessor Employer (as defined below), including trade secrets, customer/client lists, financial information, policy or procedure manuals, computer software and data, training programs and related materials, marketing materials and information, research results, information regarding corporate opportunities, the identity of clients or their business requirements, the identity of key contacts within the clients' organizations, and discoveries, inventions, ideas, concepts or product improvements, or compilations of any of the foregoing, or similar information provided to Berbee or a Predecessor Employer by customers of Berbee or a Predecessor Employer.  For purposes of this Agreement, "Predecessor Employer" means any corporation, partnership, sole proprietorship or other business entity, of which substantially all the stock or assets are acquired by Berbee.

Employee acknowledges and agrees that (i) the Confidential Business Information derives economic value from not being generally known, and not being readily ascertainable by other persons who can obtain economic value from its disclosure or use; and (ii) the Confidential Business Information is subject to efforts by Berbee to maintain its secrecy that are reasonable under the circumstances.  Confidential Business Information does not include information which is widely disclosed to the public.

-2-

Employee shall not disclose to others or use, both during his or her employment with Berbee or for a period of eighteen (18) months thereafter, except in the furtherance of the business of Berbee, any Confidential Business Information or trade secrets under Section 134.90, Wis. Stats. (the "Trade Secrets Act"), as amended, or other similar state or federal law.

5. **Duties to Prior Employers.** Berbee does not request, nor would it allow employee to disclose trade secrets or appropriately protected intellectual property of the Employee's former employers, and Employee agrees not to provide Berbee with any such trade secrets or intellectual property owned by any previous employer of Employee (other than a Predecessor Employer).

6. **Removal of Materials.** Employee will not remove from the premises of Berbee, except in the pursuit of business of Berbee, any contracts, sales invoices, purchase orders, pricing information, technical information, component, device, record, computer program, tape or other document pertaining to the business of Berbee, whether developed by Employee or by someone else unless required in the course of employment or association with Berbee.

7. **Delivery of Materials to Berbee.** Immediately upon termination of his or her employment with Berbee, Employee will return to the principal office of Berbee all written, recorded and graphical materials, documents and items (and copies thereof) in his or her possession or under his or her control and related to the business of Berbee.

8. **Injunctive Relief.** Employee agrees that in the event of his or her breach of this Agreement, Berbee shall be entitled to both injunctive relief against the continued violation thereof and compensatory damages.

9. **Absence of Conflicts.** Employee represents that there is no agreement with any other party which would conflict with his or her duties or obligations under this Agreement.

10. **Auto Insurance.** Employee agrees to acquire and maintain liability insurance covering Employee when Employee's personal vehicle is used for work-related travel. Work-related travel includes, but is not limited to, commuting to and from client sites.

11. **Inventions.** Employee shall disclose promptly to Berbee any and all significant conceptions and ideas for inventions, improvements and valuable discoveries, whether patentable or not, which are conceived or made by Employee, solely or jointly with another, during the period of Employee's employment or within one (1) year thereafter, and which are directly related to the business or activities of Berbee or which Employee conceives as a result of Employee's employment by Berbee. Employee hereby assigns and agrees to assign all Employee's interests therein to Berbee or its nominee. Whenever requested to do so by Berbee, Employee shall do what Berbee shall deem necessary to apply for and obtain Letters of Patent of the United States or any foreign country or to otherwise protect Berbee's interest therein.

12. **Miscellaneous.**

  a. **Successors.** This Agreement shall be binding upon not only the parties, but their respective successors, assigns, heirs, legal representatives, executors and

administrators, except that Employee may not assign or transfer any obligations or rights under this Agreement without the written consent of an officer of Berbee.

b. **Modification, Amendment or Waiver.** No modification, amendment or waiver of any provision of this Agreement shall be effective unless approved in writing by both parties.

c. **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement.

d. **Governing Law; Venue.** All questions concerning the construction, validity and interpretation of this Agreement shall be governed by the laws of the State of Wisconsin. The venue for any legal proceedings concerning this Agreement shall be Dane County Circuit Court, Madison, Wisconsin.

e. **Survival.** The provisions and covenants of paragraphs 4, 7, and 11 shall survive the termination of this Agreement.

f. **Consultation with Attorney.** Employee acknowledges that prior to signing this Agreement, Employee had the opportunity to consult with an attorney of his choice concerning the terms and conditions of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first indicated above.

**BERBEE INFORMATION NETWORKS CORPORATION**

By: _____

    **Diane C. Rivers, People Department Director**

By: _____

    **Amy Peterson, individually**

-4-

**EXHIBIT D**

| From: | Rick Dinkins |
|---|---|
| To: | sstraub |
| Cc: | Dave Muncie (dmuncie) |
| Subject: | Re: WOW!! Dave- don"t approve this yet!!! |
| Date: | Friday, March 12, 2010 9:36:29 AM |

Crap!  When I was in the tool, it looked like things have changed.

Sent from my iPhone

On Mar 12, 2010, at 10:30 AM, "sstraub" <sstraub@cisco.com> wrote:

This is still tied to Rick at CDW!!

On 3/12/10 10:28 AM, "pdr_program@cisco.com" <pdr_program@cisco.com> wrote:

U.S. OIP 3655661 for REDCATS USA, L.P. / CDW has been Submitted for Qualification Approval by rick.dinkins@berbee.com.

Your review and qualification decision is requested.

Please click  here <https://apps.cisco.com/ICW/PDR/home.do?actionType=viewFromUrl&dealId=1756505697&typeOfDeal=3> to access the deal.(If hyperlink does not work, please go to Cisco Commerce Workspace (formerly known as PDR): https://apps.cisco.com/ICW/PDR/home.do <https://apps.cisco.com/ICW/PDR/home.do> )

Project Name
: Redcats Wireless and Network

Partner Contact Name
: Rick-Dinkins

Partner Business/Primary Email Address
: rdinkins@netechcorp.com

Partner Organization/Company Name
: CDW