UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CDW LLC, CDW DIRECT LLC, and<br>BERBEE INFORMATION NETWORKS<br>CORPORATION, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:10-cv-530-SEB-DML |
| vs. | ) | |
| | ) | |
| NETECH CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiffs', CDW LLC, CDW Direct LLC, and

Berbee Information Networks Corporation (collectively "CDW"), Motion for Preliminary

Injunction [Docket No. 1-4], filed on April 28, 2010.  With that motion, CDW seeks an

order enjoining Defendant NETech Corporation ("NETech") from using CDW's

confidential information and trade secrets; contacting or soliciting CDW's customers;

soliciting or hiring any current CDW workers or workers terminated within the past

twelve months; and otherwise unfairly competing against CDW.  This matter came before

the Court for hearing on May 1, May 18, June 2, June 15, and July 1, 2010.  For the

reasons detailed in this entry, Plaintiffs' Motion for Preliminary Injunction is <u>GRANTED</u>.

***Factual Background***

**I.      *The Parties***

Plaintiff CDW LLC is an Illinois limited liability company with its principal place of business in Vernon Hills, Illinois.  Plaintiff CDW Direct LLC is a subsidiary of CDW LLC and is also an Illinois limited liability company.  In 1993, Plaintiff Berbee Information Networks Corporation ("Berbee") was incorporated in Delaware.  In December 2005, Berbee became a Wisconsin corporation, and in 2006, CDW Corporation, which later became CDW LLC, acquired Berbee.  CDW entities employ approximately 6,150 people and generated $7.6 billion in sales in the twelve-month period ending in March 31, 2010.  Defendant NETech is a corporation with its principal place of business in Grand Rapids, Michigan, which maintains an office in Carmel, Indiana.  Compl. ¶¶ 1-2.  NETech currently has approximately 145 employees and generated gross sales last year of $76 million.

CDW and NETech are direct competitors in the computer hardware industry.  Both sell technology products and business solution services to a wide variety of customers.  In furtherance of these businesses, both employ sales personnel as well as network engineers who assist in the assessment, installation, and services of these technology products and systems.  Compl. ¶ 5.

## II.     *NETech's Successful Efforts to Hire CDW Employees*

In February 2010, NETech began soliciting employees from CDW's Indianapolis branch.  Based on communications from at least one CDW employee, NETech believed that certain workers at CDW were dissatisfied with various aspects of their employment and were thus interested in pursuing opportunities at other companies, such as NETech. In pursuit of those employees, Mark Wierenga, the Vice President of Sales and Operations at NETech, contacted John Bannister, then the Branch Manager for the Indianapolis office of CDW.  Bannister expressed interest in working for NETech (he has since been hired by that company), and NETech enlisted his help in soliciting other CDW employees.[1]  (Pl. Ex. 10.)

On February 1, 2010, Bannister sent the following email from a private email account to certain CDW coworkers who were salespeople in Indianapolis, including Rick Dinkins and Ann Garcia, from a private email account:

> As you know, I am working hard to get a Plan B[2] fully organized.  I need a couple of things from you . . . . Please respond to this email and keep from communicating anything at work.  First, I want you to list all of your strategic deals for the next 90 days and tell me the deal/project, the size of the project, when you think it should close and when you think it would invoice under normal circumstances . . . . I am arranging for Jim Engen of Netech to come back down to get introduced to a few of you.

---

[1]According to CDW, Bannister's recruiting efforts to lure CDW coworkers to NETech were motivated by the lucrative compensation structure promised him at NETech, which was tied to that company's overall financial success.

[2]"Plan B" was the name utilized by Bannister to describe what he hoped would subsequently develop into NETech's successful effort to hire numerous CDW employees.

3

(Pl. Ex. 13.)  A few minutes later, after sending that email, Bannister sent another email to

CDW engineer Dean Lochkovic, which stated as follows:

> I am trying to arrange for Jim Engen of Netech to make a trip down to Indianapolis
> in the near future to get introduced to you . . . In the mean time, there are a couple of
> things that I want you to pull together.  First, try to get your hands on an Engineer's
> employment agreement.  Second, identify the significant projects where our engineers
> are currently engaged . . . Third, develop your list of Engineers that we would want
> to go with us . . . Fourth, have there been any changes in the compensation of any of
> the engineers . . . Fifth, give me a list of other people that would need to be part of
> Plan B to run at our current pace . . . .

(Pl. Ex. 14.)

A few days later, on Saturday, February 6, Jim Engen, President and CEO of

NETech, emailed Bannister at his personal email account, expressing excitement about

the development of these efforts to shift employees from CDW to NETech.  (Pl. Ex. 15)

("This is going to be great!").  Throughout early 2010, Bannister and individuals at

NETech exchanged further email communications detailing the likelihood that numerous

CDW prospects would, indeed, shift their employment to NETech.  Engen and Wierenga

also met with many of the targeted CDW employees on March 13, 2010, in a Marriott

Hotel conference room in Evansville, Indiana.  Compl. ¶¶ 20, 21.

On February 9, Brent Clodgo, Indianapolis Branch Manager for NETech, wrote an

email to Engen and Wierenga about the ongoing efforts to hire away CDW employees.

That email contained the following statements: (1) "I have been doing a lot of thinking

about how to message this to our Indy staff,"; (2) "We want to combine the best of

NETech with the best of Berbee,"; (3) "In Indiana we will be #1 in every category and by

every measure,"; and (4) "We will have a crushing competitive advantage."  (Pl. Ex. 17.)

In an email dated February 19, Clodgo joked with Engen and Wierenga, "If we pull this

CDW/Berbee deal off the only thing our competitors will have to chase in IN will be bids

like this one," a reference to an attached contract for "janitorial services."  (Pl. Ex. 24.)

On February 27, NETech netted another CDW employee, when Rick Dinkins, a

CDW salesperson in Indiana, accepted and forwarded a signed offer letter to Wierenga at

NETech.  Dinkins made it clear to Wierenga that his acceptance preceded his resignation

from CDW: "We can talk in more detail on Thursday, but I plan to give my 2 week notice

on Monday March 8th . . . We can map out a game plan on Thursday."[3] (Pl. Ex. 25.)

From February 27 until his departure from CDW on March 19, Dinkins emailed hundreds

of pages of purportedly confidential CDW documents to his personal email account,

mostly relating to CDW clients such as Steak-n-Shake, City of Anderson, Indiana, and

Redcats USA.

The bulk of this information was later uploaded to Dinkins's computer at NETech.

Dinkins testified that he utilized this information to create a proposal to lure the City of

Anderson away from CDW and thus to obtain that customer instead as a NETech client.

Furthermore, once Dinkins arrived at NETech, NETech allegedly began soliciting Steak-

n-Shake, Redcats USA, and other CDW customers with which Dinkins had worked while

employed at CDW.

_____

[3]NETech now admits that for a period of time Dinkins was on its payroll while he was
also concurrently employed by CDW.

Another CDW employee targeted by NETech, Amy Peterson, also transferred confidential documents and other materials during her shift from CDW to NETech.  On March 10, she informed Wierenga that she had given notice of her termination to CDW. When Wierenga asked her how long CDW expected her to stay, she responded, "My last day is scheduled 3/22/2010 . . . I am figuring out the last of my replacements today and will begin transferring data tomorrow/Friday . . . ."  (Pl. Ex. 30.)  On March 21, the day before her last day of employment at CDW, Peterson contacted a NETech Human Resources Coordinator and stated, "I want to make sure I bring any important documents when I come to Grand Rapids [to meet with NETech representatives].  Can you let me know anything you'll need from me?"  (Pl. Ex. 37.)

Nicole Sawa, another former CDW employee who moved to NETech as part of its efforts challenged in this litigation, testified that prior to leaving CDW she loaded every single file from her work computer onto an external hard drive.  (Tr. 126.)  Given Ms. Sawa's position at CDW, her computer contained CDW Statements of Work, Bills of Materials, draft quotations, CDW's Services Calculator, formatted spreadsheets used in estimating project costs for customers, along with many other important documents.  (Tr. 141, 142.)  Further testimony of Ms. Sawa and CDW's forensic computer witness, Andy Grau, established the likelihood that she also downloaded files onto other such external drives.  (Tr. 154, 160-161; Ex. 97.)

Ms. Sawa testified that, upon arriving at NETech, she loaded all of the information on these drives onto her NETech computer.  (Tr. 134-35.)  Coincident with the filing of

this lawsuit by CDW, however, Ms. Sawa erased all of the information on the external

hard drive containing the files she had downloaded from her CDW computer and

transferred to her NETech computer.  (Tr. 138.)  CDW alleges that she enlisted the

assistance of Brian Walls, a computer engineer who also had left CDW and joined

NETech, to ensure that the hard drive no longer contained any of the CDW files and

materials.  (Tr. 138-139.)

On April 1, 2010, Bannister, who had been participating in NETech's efforts to

hire CDW employees since February, finally gave notice to CDW that he was terminating

his employment with them, thereby joining Dinkins, Garcia, Peterson, and the other

former CDW employees at NETech.  In an email to NETech executives on that day

entitled "John's free," Engen warned that NETech personnel should be careful moving

forward:

> John resigned this afternoon.  Apparently a lady from the old Berbee HR dept
> is on a witch hunt to dig something up on John.  John's boss Terry said that
> they can't find anything and legal has told them it's all circumstantial.  If we
> lay low (which Rick [Dinkins] and Ann [Garcia] are not really doing . . . we
> need to slow them down) this could be a non-event.
> . . .
> I called both Ann and Amy [Peterson] this morning and told them to lay low
> and not talk with anyone about the current situation or anything else . . . .

(Pl. Ex. 40.)  Brent Clodgo responded to this by email with the statement, "We should

delete this email thread."  (Id.)

### III.    CDW's Asserted Grounds for Relief

All six of the departing CDW employees–Bannister, Dinkins, Garcia, Peterson, Sawa, and Brian Wells–had entered into employment agreements with CDW or Berbee, and each of these agreements contained non-competition, non-solicitation, and confidentiality provisions.  See Compl. (Exs. A-E.)  With the present action, CDW seeks to enjoin what it asserts are efforts by NETech to encourage CDW employees to violate these agreements.[4]

At the hearing before the Court relating to the present motion, Wierenga testified that he never encouraged former CDW employees Dinkins and Peterson to utilize confidential information acquired at CDW, and that he believes Dinkins's use of such information was inappropriate.  He also admitted that his own request for salary information from Dean Lochkovic was also improper.[5]  CDW contends that NETech has, in fact, fostered the inappropriate use of its trade secrets, in addition to encouraging CDW employees to lure coworkers away from their employment at CDW, thereby violating numerous Indiana statutes as well as encouraging the former CDW employees to violate

---

[4]In a parallel proceeding in Wisconsin State Court, a preliminary injunction has issued enjoining certain former CDW employees from violating their non-compete agreements with CDW.  CDW Direct, LLC, et al. v. Peterson et al., Case No. 10-cv-2144 (Wis.Cir.Ct. June 30, 2010).  Whereas that action has been brought against the individual employees to enforce their non-compete agreements, the present litigation has been brought against NETech to remedy perceived violations of Indiana unfair competition and trade secrets law.  The individual employees are not parties to the present action, and any order from this Court will therefore not interfere with that ongoing proceeding.

[5]Wierenga testified that he told Dinkins and Peterson to stop using such information, though he admitted that he did not thoroughly investigate the matter.  (Tr. 20.)

their non-compete agreements.

CDW asserts that the former CDW employees now working for NETech had access to the following confidential information while they were employees of CDW: customer and prospective customer lists; partner and pricing information; project lists; pricing and margin strategies; shipping strategies; sales methods and strategies; growth strategies; and current and historical financial performance information.  Compl. ¶ 9.  The former CDW employees managed all aspects of CDW's Indiana relationships with hundreds of customers and numerous key vendor partners, and thus those employees were granted access to numerous pieces of sensitive confidential information.  Compl. ¶ 15.

CDW avers that it has engaged in extensive efforts to protect such information, including: requiring employees to sign confidentiality agreements; requiring certain employees to sign post-employment restrictive covenants; limiting access to confidential information; password protecting all computers; instructing personnel not to disclose certain information; requiring all confidential materials to be returned after use by permitted employee; programming computer systems to lock automatically; prohibiting the use of personal cameras on CDW property; and restricting employee access to customer account databases.  Compl. ¶ 13.

CDW contends that NETech has reviewed and analyzed CDW's confidential information, as well as directed former CDW employees to use confidential and trade secret information to benefit NETech.  Compl. ¶¶ 25, 26.  CDW further alleges that NETech has encouraged former CDW employees to exploit and develop customer

contacts made while they were employed by CDW.  Compl. ¶ 40.

Accordingly, through this Motion for Preliminary Injunction, CDW seeks to enjoin NETech from the following: further use of CDW's trade secrets and confidential information, unfair competition of any sort, future contact with CDW's customers using information gained from former CDW employees, and further solicitations, negotiations or hiring of any additional CDW employees that would abet their violations of non-compete restrictions applicable to them.[6]

### *Legal Analysis*

**I.    *Standard of Review***

The grant of injunctive relief is appropriate if the moving party is able to demonstrate: (1) a reasonable likelihood of succeeding on the merits; (2) irreparable harm if preliminary relief is denied; and (3) an inadequate remedy at law.  Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008).  If the moving party fails to demonstrate any one of these three threshold requirements, the emergency relief must be denied.  Id.  However, if these threshold conditions are met, the Court must then assess the balance of harm – the harm to Plaintiffs if the injunction is not issued against the harm to Defendant if it is issued –

---

[6]In addition to the former CDW employees NETech hired, NETech has also solicited, or is currently soliciting, CDW employees Doug Bobo, Karen Grund, Brian Maddox, Ryan Greer, Chris Fortune, Scott Tilev, and Mike Voegele.

and, where appropriate, also determine what effect the granting or denying of the

injunction would have on nonparties (the public interest).  Id.

In determining whether to grant injunctive relief, the district court must take into

account all four of these factors and then "exercise its discretion 'to arrive at a decision

based on the subjective evaluation of the import of the various factors and a personal,

intuitive sense about the nature of the case." Id. (quoting Lawson Products, Inc. v. Avnet,

Inc., 782 F.2d 1429, 1436 (7th Cir. 1986)).  This process involves engaging in what is

called the "sliding scale" approach, meaning that "the more likely it is the plaintiff will

succeed on the merits, the less balance of irreparable harms need weigh toward its side;

the less likely it is the plaintiff will succeed, the more the balance need weigh towards its

side." Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992).  The

sliding scale approach "is not mathematical in nature, rather 'it is more properly

characterized as subjective and intuitive, one which permits district courts to weigh the

competing considerations and mold appropriate relief.'" Ty, Inc. v. Jones Group, Inc.,

237 F.3d 891, 895-96 (7th Cir. 2001) (quoting Abbott Laboratories, 971 F.2d at 12).


## II.    *Likelihood of Success on the Merits*

CDW asserts five claims against NETech in its Complaint: Tortious Interference

with Contractual Relationships (Count I); Tortious Interference with Business

Relationships (Count II); Misappropriation of Trade Secrets (Count III); Conspiracy to

Breach Fiduciary Duty (Count IV); and Unfair Competition (Count V).  Based on the

11

evidence submitted at the hearing before the Court and the discovery conducted thus far, we hold for the reasons discussed below that CDW is likely to succeed on more than one of these claims.

A.    *Tortious Interference With Contract Claim*

More than one of CDW's claims depends, in part, on the validity and enforceability of the Employee Agreements signed by former CDW employees.[7]  The success of CDW's tortious interference with contract claim, for example, depends on its ability to show valid and enforceable underlying contracts, and NETech's conduct interfering with those contracts.  E.g., Conn-Selmer Inc. v. Bamber, 2008 WL 348774 (N.D. Ind. Feb. 7, 2008).  Thus, if the agreements between CDW and its former employees are invalid or unenforceable, the likelihood that CDW will succeed on the merits of such claims is greatly diminished.

The Dinkins, Garcia, and Peterson non-compete agreements provide:

Employee agrees that while employed by Berbee and for a period of equal to his or her length of employment, but not greater than twelve (12) months from the termination of this Agreement for whatever reason, he or she shall not directly or indirectly, whether as an owner, stockholder, partner, employee, consultant, agent, independent contractor or otherwise, for himself or herself,

---

[7]NETech contends that the CDW entities may not enforce the employment agreements because those agreements were made between the former employees and Berbee, rather than with CDW itself.  However, CDW is the surviving entity after a merger with Berbee, and it is well established that the surviving entity is entitled to enforce an employment agreement containing a covenant not to compete even without a separate assignment of that agreement. E.g., Farm Credit Serv. of North Central Wisconsin, ACA v. Wysocki, 627 N.W.2d 444, 450-53 (Wis. 2001).

or on behalf of any other person or entity, engaged directly or indirectly, or
enter into any aspect of the business of Berbee . . . .

(Def. Ex. L.)  These agreements expressly state that they are to be governed by Wisconsin
law.

In Wisconsin, as elsewhere, courts scrutinize covenants not to compete closely,
given that they are often the product of uneven bargaining power.  Streiff v. American
Family Mut. Ins. Co., 348 N.W.2d 505, 510 (Wis. 1984).  To that end, a valid non-
compete agreement must meet a five-part test: (1) it must be reasonably necessary for the
protection of the legitimate business interest of the employer; (2) it must provide for a
reasonable territorial limit; (3) it must provide a reasonable time limit; (4) it must not be
harsh or oppressive to the employee; and (5) it must be reasonable as to the general
public.  Wausau Medical Center v. Asplund, 514 N.W.2d 34, 38 (Wis.Ct.App. 1994); see
also Wis. Stat. § 103.465.  The employer bears the burden of establishing the necessity of
the restraints it has sought to impose with the provision.  Geocaris v. Surgical Consultants
Ltd., 302 N.W.2d 76, 77 (Wis.Ct.App. 1981).

The Wisconsin Supreme Court has recently made clear that reasonable restrictions
on solicitation of former customers and provisions ensuring the protection of confidential
documents, such as those contained in the contracts in this case, are enforceable.  Star
Direct, Inc. v. Dal Pra, 767 N.W.2d 898 (Wis. 2009).  Thus, restrictions proscribing the
solicitation of former customers for a reasonable time period (one year in the Star Direct
case) are legally valid and enforceable.  Id. at 298.  The Star Direct Court reasoned that a

13

former employee's "special knowledge of customer needs, pricing and profit margins" makes her a "real danger in seeking [the former employer's] current and past customers." Id.[8]

In the case at bar, the departing CDW employees clearly had special knowledge of CDW customers as well as their purchasing needs and the pricing arrangements offered them by CDW.[9]  Indeed, many of those employees bore the primary responsibility at CDW for developing CDW's relationships with those customers.  Moreover, these agreements constitute reasonable protections of CDW's interests and reasonable limitations on the former employees' post-termination activities.  Thus, the evidence before the Court at this stage demonstrates that the non-compete agreements between these employees and CDW are valid and enforceable.

The agreement between CDW and former employee Nicole Sawa is similarly enforceable.  Her non-compete provision differs somewhat from those just discussed, in that it runs for six months rather than a year and the restrictions on competition are more

---

[8]Plaintiff urges the Court to focus on another holding in Star Direct, to wit, that when an employment contract has multiple non-compete provisions, an "inextricable textual link" between two such provisions necessitates that one provision cannot be interpreted without reference to the other.  Star Direct, 767 N.W.2d at 287, 308.  Thus, if one provision is invalid as overly broad, the other must be also.  Here, however, the restrictions in the employment agreements are specifically enumerated, and thus no inextricable link connects any separate, potentially overly broad provision with those at issue here.  Thus, this holding in Star Direct does not apply to invalidate the non-compete provisions in the case at bar, which are divisible from other portions of the agreements, and are sufficiently clear and limited to be enforceable.

[9]Their knowledge and expertise was, in fact, a primary factor in NETech's recruitment of them; the statements attributed to CEO Jim Engen who said that NETech was interested in hiring these CDW employees only for the high quality people they were are not credible.

14

clearly enumerated.  (Def. Ex. E.)  The restrictions on her activities, and the geographic

scope of those restrictions, are less burdensome than the restrictions imposed on Dinkins,

Garcia, and Peterson and are enforceable for the same reasons that those agreements are

enforceable.

The final non-compete agreement at issue, between CDW and John Bannister,

states that it is governed by Illinois law.  Pursuant to that agreement, Bannister is

restricted for six months following the termination of his employment at CDW, as

follows:

> The employee will not engage in any Business . . . being conducted or planned
> by the Company or any of its subsidiaries as of the Termination Date in any
> geographic area in which the Company or any of its subsidiaries is conducting
> Business or plans to conduct such business as of the Termination Date.  The
> restriction contained in this Section . . . shall apply to the Employee engaging
> in any such Business either directly or indirectly through any person, firm
> corporation, partnership or other enterprise, or as an officer, director,
> stockholder, partner, investor, employee or consultant thereof, or otherwise.

(Def. Ex. J.)  This agreement also includes a non-exhaustive list of thirty-seven

companies CDW considered, by way of example, to be competitors of CDW.

Overly broad covenants are also unenforceable under Illinois law.  See Lawrence

and Allen, Inc. v. Cambridge Human Resource Group, Inc., 685 N.E.2d 434 (Ill. App.

1997) (refusing to enforce a non-compete provision with a geographical limitation

encompassing the entire United States).  see also Mohanty, M.D. v. St. John Heart Clinic,

S.C., 866 N.E.2d 85 (2006).  "[W]hen presented with the issue of whether a restrictive

covenant should be enforced, [a court] should evaluate only the time-and-territory

restrictions contained therein.  If the court determines that they are not unreasonable, then the restrictive covenant should be enforced."  Sunbelt Rentals, Inc. v. Ehlers, 915 N.E.2d 862, 869 (Ill.App. 2009).  The six-month limitation placed on Bannister's post-termination activities is in our view under the circumstances of this case entirely reasonable.  See Unisource Worldwide v. Carrara, 244 F.Supp.2d 977, 983 (N.D. Ill. 2003).  Furthermore, the geographic limitation, though potentially very broad, is also reasonable under the circumstances.  See Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc., 879 N.E. 512 (Ill.App. 2007).

Accordingly, for the foregoing reasons, we hold that CDW's employment agreements are likely to be found valid and enforceable on the merits.  In addition, the evidence introduced in connection with the parties' evidentiary presentations demonstrated that former CDW employees, including Sawa, Dinkins, and Peterson, did, in fact, transport sensitive business material belonging to CDW when they moved to NETech. Because CDW has established that attempts were made by these employees to interfere with business relationships and that NETech fostered such interference, CDW has shown that it is likely to succeed on its claim of Tortious Interference with Contractual Relationships.[10]  E.g., Melton v. Ousley, 925 N.E.2d 430, 440 (Ind.Ct.App.

---

[10]The only claim with regard to which CDW has not fully demonstrated its likelihood of success is the second count of its Complaint, a claim of Tortious Interference with Business Relationship, asserting that NETech's actions have disrupted CDW's relationships with its customers.  In order to prevail on this claim, CDW must establish: (1) the existence of valid relationships between themselves and their customers; (2) defendant's knowledge of the relationships; (3) defendant's international interference with the relationships; (4) the absence of

(continued...)

2010).

B.    *Trade Secrets Claim*

In support of its trade secret claim, CDW has provided a list of trade secrets allegedly misappropriated by NETech.  Included in these are prospective customer lists; partner and pricing information; project lists; pricing and margin strategies; shipping strategies; sales methods and strategies; growth strategies; and current and historical financial performance information.  Compl. ¶ 9.

Under the Indiana Uniform Trade Secrets Act, a trade secret is: (1) information; (2) deriving independent economic value; (3) not generally known or readily ascertainable by proper means by another who can obtain economic value from its disclosure or use; and (4) the subject of efforts, reasonable, under the circumstances, to maintain its secrecy.  Amoco Production Co. v. Laird, 622 N.E.2d 912 (Ind. 1993).  The evidence submitted by CDW demonstrates that departing CDW employees acting without authorization or even the knowledge of CDW took with them for use at NETech numerous materials that likely satisfy this test, including customer quotes, statements of

---

[10](...continued)
justification; and (5) damages resulting from the interference.  Credentials Plus, LLC v. Calerone, 230 F.Supp.2d 890, 903 (N.D. Ind. 2002).  The final element of a tortious interference claim that a plaintiff must show is that the defendant engaged in illegal conduct.  Reginald Martin Agency, Inc. v. Conseco Medical Insurance Co., 388 F.Supp.2d 919, 930 (S.D. Ind. 2005).  CDW has yet to identify the illegal conduct at issue.  That a likelihood of success has not been established as to this claim is not dispositive, however, given that CDW is clearly likely to succeed on the remainder of its claims.

work, bills of materials, services calculations, floor plans, system designs, pricing models, compensation information and other materials.  (E.g., Tr. 126, 141-42, 154, May 18, 2010).  Therefore, based on CDW's allegations and evidence that such materials were improperly transferred to NETech, CDW is likely to prevail on this claim as well.

C.     *Conspiracy to Breach Fiduciary Duty*

Count IV of the Complaint alleges that NETech has conspired with former CDW employees to breach those employees' fiduciary duties to CDW.  Compl. ¶ 71.  CDW's evidence shows that NETech did this through a variety of means, including *inter alia* paying a CDW employee Rick Dinkins, while he was working for CDW, to assist in the efforts undertaken by NETech to identify and hire away numerous CDW employees. Therefore, CDW is likely to succeed on this claim.

D.     *Unfair Competition Claim*

Count V of the Complaint accuses NETech of raiding CDW's workforce and thereby engaging in unfair competition.  "The tort of unfair competition is premised upon the rationale that a person who has built up good will and reputation for his business is entitled to receive the benefits from his labors. [Indiana] courts have held that such an interest is a property right deserving judicial protection."  Hammons Mobile Homes, Inc. v. Laser Mobile Home Transport, Inc., 501 N.E.2d 458, 460-61 (Ind.Ct.App. 1986) (citing Hartzler v. Goshen Churn and Ladder Co., 104 N.E. 34, 37 (1914)).  Thus, under

Indiana law, the tort of "unfair competition" encompasses acts that "although . . . generally considered a fair and welcomed part of vibrant competition, [are engaged in] for the primary purpose of destroying a competing business." Bartholemew County Beverage Co., Inc. v. Barco Beverage Corp., Inc., 524 N.E.2d 353, 358 (Ind.Ct.App. 1988) (holding that the tort includes the "palming" of one's goods or services as those of someone else, as well as actions for the interference with a contract or business relationship and predatory price cutting).

CDW's allegations, especially those evinced by emails in the record, clearly have the potential to demonstrate that the "primary purpose" of NETech's actions was to "destroy[] a competing business," namely, CDW's business in Indiana. Bartholemew County Beverage Co., Inc. v. Barco Beverage Corp., Inc., 524 N.E.2d 353, 358 (Ind.Ct.App. 1988). For example, NETech Branch Manager Brent Clodgo's statement to NETech executives Engen and Wierenga that hiring the former CDW employees would give NETech a "crushing competitive advantage" encompasses, in the context of the other relevant facts before the Court, all of the elements of an unfair competition claim. Therefore, CDW is also likely to succeed on its unfair competition claim.

### III.   *Irreparable Harm*

When an employee has been hired in violation of an employment agreement, Indiana courts will infer that the plaintiff has been irreparably harmed. Gleeson v. Preferred Sourcing, LLC, 883 N.E.2d 164, 178 (Ind.Ct.App. 2008). This is because the

loss of confidential information, customer relationships, and employee morale are all injuries that are difficult to quantify in an action at law.  Barlow v. Sipes, 744 N.E.2d 1, 7 (Ind.Ct.App. 2001).  Accordingly, because NETech has failed to advance any availing rationale to rebut this inference, we find that CDW will be irreparably harmed in the absence of injunctive relief.

### IV.  Balance of Harms

In considering the impact of the relief sought by CDW, the Court must consider the potential effects to non-party individuals who wish to be employed NETech.  See Clorox Co. v. Johnson & Sons, Inc., 627 F.Supp.2d 954 (E.D. Wis. 2009) (holding that the balance of harm disfavored an injunction that would have prevented an employee from pursuing his career with the defendant).  The Court must also consider the interests of non-party customers, specifically their rights to conduct business freely with the party they choose, rather than to have their business decisions delimited by a court order.  See PrimeCare Home Health v. Angels of Mercy Home Health Care, LLC, 824 N.E.2d 376, 382 (Ind.Ct.App. 2005).  These harms are primarily relevant, however, in our assessment of the proper scope of the injunction, which is discussed below.  See infra § V.

Indeed, despite the potential hardship to such non-parties, the potential for irreparable harm to CDW is far greater, including the loss of significant trade secrets and confidential information, reputation damage, and the wrongful loss of numerous customers.  See Universal Engraving, Inc. v. Duarte, 519 F.Supp.2d 1140 (D. Kan. 2007)

(holding that the balance of harm weighs in favor of an employer whose valuable confidential information is imperiled by a departed employee); Interbake Foods, LLC v. Tomasiello, 461 F.Supp.2d 943, 977 (N.D. Iowa 2006).  Accordingly, we find that the balance of harm favors the issuance of an injunction.

## V.   Public Interest

The public interest here, which favors CDW, is clearly embodied in the Indiana Uniform Trade Secrets Act, which aims to prevent harm like that alleged and demonstrated by CDW.  See Interbake Foods, 461 F.Supp.2d at 978.  That public interest clearly favors CDW and the issuance of an injunction in this case.

## VI.   Scope of the Injunction

CDW requests that the Court issue an injunction encompassing and enjoining NETech from engaging in the following activities: (1) selling products or services to CDW customers with whom any recently hired NETech employees worked while at CDW; (2) using or disclosing any of CDW's confidential or trade secret information that they have received from any current or former CDW employee; (3) soliciting or hiring any CDW employees in Indiana; and (4) mandating the return of all such information and documents to CDW together with an affidavit attesting that no copies, electronic or otherwise, have been maintained in any form.  For the foregoing reasons, CDW has met its burden of demonstrating the necessity of an injunction in this case.

The record does not, however, demonstrate the need for, or appropriateness of, a proscriptive instrument of such sweeping scope as what CDW has requested. Indeed, both Wisconsin and Indiana law are clear about the need to tailor restraints such as the one requested in this case narrowly. Because "injunctions are limited to prohibiting injurious interference with rights . . . injunctive relief may and should be coextensive with the danger sought to be avoided by it." Burk v. Heritage Food Service Equipment, Inc., 737 N.E.2d 803 (Ind.Ct.App. 2000). Thus, as numerous courts have done in similar situations, we shall narrow the requested injunctive relief to addressing the injuries to CDW's rights, as embodied in the non-compete agreements. See, e.g. Barnes Group, Inc. v. Rinehart, 2001 WL 301433 (S.D. Ind. Feb. 26, 2001).

CDW's requests that NETech be enjoined from selling to any CDW customers "with whom any recently hired NETech employees worked while at CDW" and "from soliciting or hiring any CDW employees in Indiana" are entirely too broad in light of the subject non-compete agreements, in addition to being an intolerable restriction on the free movement of employees and the market freedom of customers of the services provided by NETech and CDW. See Heyde Companies, Inc. v. Dove Healthcare, LLC, 654 N.W.2d 830 (Wis. 2002). Accordingly, the injunction issued here shall restrict NETech's practice of hiring CDW employees only when that practice runs afoul of specific employment agreements, or when such activity contravenes Indiana laws prohibiting unfair competition and the improper use of trade secrets.

CDW's central concern in this litigation is the protection of its valuable trade

secrets.  We shall therefore fashion an injunction directed toward NETech's activities that

is consistent with the prohibitions encapsulated in CDW's employment agreements, while

also ensuring that no more activity than necessary be enjoined, thus also protecting the

interests of other parties and non-parties.  Furthermore, the injunction shall not be

directed toward the activities and rights of the former CDW employees, who are not

parties to this action and who are in any event bound by the injunction issued in the

parallel litigation proceeding in Wisconsin State Court, which this Court's Order shall in

no way impact or impair. See CDW Direct, LLC, et al. v. Peterson et al., Case No. 10-cv-

2144 (Wis.Cir.Ct. June 30, 2010).


## VII.    Security

Federal Rule of Civil Procedure 65(c) provides in relevant part that, "[t]he court

may issue a preliminary injunction or a temporary restraining order only if the movant

gives security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R.

Civ. Pro. 65(c).  Under Seventh Circuit law, because "the amount of the security rests

within the discretion of the district judge, the matter of requiring a security in the first

instance [is] recognized . . . as also resting within the discretion of the district judge."

Scherr v. Volpe, 466 F.2d 1027, 1035 (7th Cir. 1972) (holding that the district court did

not abuse its discretion in failing to require the plaintiffs to post a security when the

plaintiffs showed a strong likelihood of success on the merits).  Considering that CDW is

a corporation in good standing and has made a strong showing that it is likely to succeed

on the merits of its trademark infringement claim, we find that their posting of security is

unnecessary in this case.

## VIII.  Conclusion

For the reasons detailed in this entry, Plaintiffs' Motion for Preliminary Injunction

is <u>GRANTED</u>.

Defendant NETech and its representatives, agents, employees, successors, and

assigns, are hereby <u>ENJOINED</u> as follows:

1.  NETech is enjoined from retention, communication, distribution, or other such use of any confidential materials or trade secret information obtained by CDW's former employees now employed by NETech, and shall forthwith diligently and thoroughly search for and relinquish to CDW any and all such materials in its possession.

2.  NETech is enjoined from interfering with the former CDW employees' covenants not to compete or disclose confidential information in any way through territory or account assignments, or directing or encouraging contacts with accounts previously developed or serviced by the former CDW employees while those employees were employed by CDW, or from remunerating these employees for any such work produced on behalf of NETech; or in any other way employing, engaging, or otherwise assisting any former CDW employee to perform any duties or services that would in any respect violate the terms of his/her covenant not to compete and confidentiality agreement as well as this preliminary injunction, both of which prohibitions shall commence with the date of the issuance of this Order and extend for such a time as to be in accordance with the time periods contained in each relevant employee's non-compete agreement.  This prohibition shall also be coextensive with the injunction in the parallel Wisconsin State Court litigation;

3.  NETech is enjoined from recruiting or hiring any other CDW sales agents to perform work in Indiana who are subject to comparably drawn covenants not to compete, while at the same time placing them in the same territories they served

when employed by CDW with responsibility for their former customer accounts, for the duration of and consistent with the non-compete agreements between CDW and its current and former employees.  When and if NETech engages in future recruitment efforts targeted at CDW employees, notice of such contacts must be provided to NETech's counsel who shall thereafter communicate with CDW's counsel to ensure that those contacts are consistent with and do not encourage violations of the targeted employees' non-compete agreements;

4.      NETech is *not* enjoined from attempting further sales to or servicing of CDW customers tied to or otherwise associated with the former CDW employees, so long as the contacts maintained by NETech with those customers are conducted by someone other than the former CDW employees, while such employees are subject to CDW non-compete agreements.  Any such sales or servicing must be performed without reliance on confidential CDW materials or information which NETech may have access.

5.      This Order in no way impacts or impairs the parties' rights in the related ongoing proceeding in Wisconsin State Court, CDW Direct, LLC, et al. v. Peterson et al., Case No. 10-cv-2144 (Wis.Cir.Ct. June 30, 2010), and shall therefore have no precedential impact on that or any other pending litigation.

IT IS SO ORDERED.

Date: _____07/07/2010_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Craig T Boggs
PERKINS COIE, LLP
cboggs@perkinscoie.com

Michael R. Brunelle
BARNES & THORNBURG LLP
mbrunelle@btlaw.com

Brian D. Burbrink
BAKER & DANIELS - Indianapolis
brian.burbrink@bakerd.com

David A. Given
BAKER & DANIELS
dagiven@bakerd.com

Donald E. Knebel
BARNES & THORNBURG LLP
donald.knebel@btlaw.com

Dwight D. Lueck
BARNES & THORNBURG
dwight.lueck@btlaw.com

Laurence John Oleksa
PERKINS COIE, LLP
loleksa@perkinscoie.com

Jennifer Lynn Schuster
BARNES & THORNBURG LLP
jschuster@btlaw.com

Aaron M. Staser
BARNES & THORNBURG LLP
aaron.staser@btlaw.com

Eric E Walker
PERKINS COIE, LLP
ewalker@perkinscoie.com