UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CDW LLC, CDW DIRECT LLC, and ) <br> BERBEE INFORMATION NETWORKS ) <br> CORPORATION (n/k/a CDW ) <br> TECHNOLOGIES, INC.), ) <br> ) <br>       Plaintiffs, ) <br> ) <br>   vs. ) <br> ) <br> NETECH CORPORATION, ) <br> ) <br>       Defendant. ) | CASE NO.:  1:10-cv-0530-SEB-DML |

## Order on Defendant's Motion to Exclude Expert Testimony

Defendant NETech Corporation moves (Dkt. 256) to exclude on *Daubert* grounds expert testimony by Mark Hosfield regarding damages, including lost profits, suffered by the plaintiffs because of NETech's alleged tortious misconduct in raiding employees and customers of CDW's Indianapolis branch.

### CDW's Allegations in the Amended Complaint[1]

The plaintiffs and defendant NETech are competitors that sell technology products and solutions to businesses. Both employ "sales personnel and network engineers who assist in the assessment, installation and services" of technology systems and associated products. (Amended Complaint, Dkt. 131 at ¶7). In early 2010, NETech began recruiting employees to leave CDW's Indianapolis office and to work for NETech at NETech's Carmel, Indiana office. NETech was successful in recruiting and hiring away John Bannister, the former branch manager of CDW

---

[1] This background regarding the plaintiffs' claims is taken from the amended complaint and is provided to give context to the *Daubert* motion. These are not findings by the court and are matters the plaintiffs intend to prove at trial.

Direct's Indianapolis office; Ann Garcia and Rick Dinkins, former CDW Direct advanced technology account executives; Nicole Sawa, a former CDW Direct solution architect; Gary "Dean" Lochkovic, a former Berbee [2] lead network engineer; and Brian Walls, Jason Netherland, and Purushothaman Nammalwar, former Berbee network engineers, and several other account executives or engineers. (*Id.* ¶¶11-12). All went to work for NETech in the same or similar work capacities they had held with CDW Direct or Berbee at the Indianapolis office.[3] (*Id.*). These employees had regular and extensive access to CDW's confidential business and trade secret information which they used to develop, design, sell, implement, and service complex technological solutions for CDW's customers. (*Id.* ¶¶14, 21, 22). Many of these employees also were subject to non-solicitation obligations that prohibited them for a period of 6 or 12 months after their employment ended from (a) soliciting customers with whom they worked and (b) soliciting for hire any of their co-workers. (*Id.* ¶ 24).[4]

The plaintiffs allege that NETech, aware of the employees' contractual obligations to preserve and protect confidential and trade secret information and to refrain from soliciting customers and co-workers, induced them to breach their obligations as part of a systematic raid of CDW's Indianapolis employees, to decimate CDW's Indianapolis branch, and to obtain

---

[2]      Berbee is a company that had been purchased by CDW in 2006.

[3]      As the court understands it, some of the employees at the Indianapolis office were employed by CDW Direct and some were employed by Berbee.

[4]      On February 16, 2012, the court granted summary judgment (in part, as clarified by Dkt. 277) to NETech on the plaintiffs' claim that NETech tortiously interfered with the former CDW Direct employees' contractual obligations not to solicit customers or co-workers following the termination of their employment. The court ruled that these contractual obligations began to run when the employees were transferred from Berbee to CDW Direct and, for some, the contractual obligations had terminated many months before these employees went to work for NETech in the Spring 2010. (Dkt. 255). *See also* Dkt. 277 (recognizing that the summary judgment order applies only to employees whose agreements were with Berbee and were later employed by a different CDW LLC affiliated entity before resigning, and whose contractual obligations had run before they resigned).

CDW's customers for NETech. (*See id.* ¶¶11, 16, 26). These employees left CDW for NETech's Carmel office in March, April, and May 2010. (*Id.*¶¶ 41, 42-49). Shortly before leaving CDW for NETech, some of the employees transferred CDW's confidential and trade secret information to flash drives and personal email accounts with the intent—and with NETech's encouragement—to share the information with NETech and use it to advance their new careers at NETech. (*Id.* ¶¶31-34). After beginning work for NETech, the former employees—with NETech's knowledge, encouragement, and facilitation—used CDW's confidential information and trade secrets to gain business for NETech, including through solicitation of their old CDW customers to give new business to NETech. (*Id.* ¶¶63-65).[5] The plaintiffs also complain that the employees and NETech disparaged CDW and spread misinformation to the Indianapolis branch's market of customers and to technology vendors such as Cisco. (*Id.* ¶68).

The plaintiffs seek relief against NETech under the following legal theories: (1) tortious interference with the employees' contractual obligations to maintain the confidentiality of confidential and trade secret information and to refrain from soliciting customers and co-workers (Count I)[6]; (2) tortious interference with CDW's business relationships with its customers (Count II); (3) tortious interference with CDW's employment relationships (Count III); (4) misappropriation of trade secrets (Count IV); (5) conspiracy with CDW's employees to breach their fiduciary duties to CDW (Count V); and (6) unfair competition (Count VI).

---

[5]   On July 7, 2010, the court granted preliminary injunctive relief to the plaintiffs and, among other things, enjoined NETEch from retaining, communicating, distributing, or otherwise using any confidential information or trade secrets possessed by CDW's former employees that left for NETech. (Dkt. 96).

[6]   *See* note 3, *supra,* regarding the court's summary judgment ruling on this claim.

**Mr. Hosfield's Expert Opinions**

Mark Hosfield has extensive experience as a financial consultant and currently concentrates his professional career as a consulting and testifying expert for clients immersed in commercial disputes. (Dkt. 272-2, p. 25). He is a CPA and Certified Management Accountant, and has a master's degree in management, finance, accounting, and operations management from Northwestern University's Kellogg Graduate School of Management. (*Id.*). Mr. Hosfield began his career in the early 1980s as a vice president of finance and controller for a business. He then spent about 20 years, at a management or partner level, working for national accounting firms (Coopers & Lybrand LLP, Arthur Andersen LLP, and KPMG LLC) and focused his work on litigation and other dispute analysis services for clients. In 2003, he began his own financial consulting firm. (*Id.*)

Mr. Hosfield's expert opinions are, assuming NETech is found liable to the plaintiffs:

1a. CDW (presumably meaning the plaintiffs collectively) suffered lost profits because of NETech's conduct of $4,960,859 through September 30, 2011;

1b. As an alternative measure of lost profits, NETech's sales to customers of the recruited CDW employees account for lost profit damages of $2,217,473 through September 30, 2011.

1c. CDW suffered future lost profit damages, made up of lost profits through 2015 and some indefinitely, in the amount of $13,804,701 (discounted to September 30, 2011).

1d. As an alternative measure of future lost profits, NETech's sales to customers of the recruited CDW employees account for future lost profit damages of $8,750,399.

2a. CDW incurred recruiting, training, and marketing expenses of $577,055 because of NETech's actions.

2b. CDW expended management time valued at $278,054 to control the damage to the business caused by NETech's actions.

2c. CDW paid increased compensation of $125,610 to certain individuals as a result of NETech's actions.

      3.     CDW paid $178,687 in compensation and expense reimbursements to employees not faithfully working for CDW because of NETech's actions.

(Dkt. 272-2 at p. 10).

NETech's motion does not seek to exclude on *Daubert* grounds Mr. Hosfield's expert opinions described above in 2a, 2b, 2c, or 3.

**1a. Lost profits through September 30, 2011**

Mr. Hosfield's lost profits calculation rests on his analysis of the decrease in Advanced Technology revenue at the Indianapolis branch from March 2010 through September 30, 2011, that he attributes to NETech's conduct. Mr. Hosfield's work first required identifying the Indianapolis's branch's historic Advanced Technology products and services revenue. As addressed in this entry, NETech attacks Mr. Hosfield's reliance on AT revenue data supplied by CDW without "independent verification."

Next, Mr. Hosfield, based on a yardstick analysis—the yardsticks being other CDW branches in the Great Lakes region—determined the service and product revenue growth rates that the Indianapolis branch would have achieved but for NETech's conduct. For 2010, he used 23% service revenue growth and 25% product revenue growth because those are the average growth rates achieved by CDW's other branches in the Great Lakes region. For 2011, he used 21% for service revenue and -1% for product revenue based on the same yardstick average analysis. As discussed in this entry, NETech attacks as unreliable Mr. Hosfield's yardstick analysis.

Finally, Mr. Hosfield applied CDW's historic profit margins for products and services and determined the additional incremental expenses CDW would have incurred to meet the revenue growth (such as sales commissions, and sales and benefits for two sales positions) to

reach his net lost profits amount through September 30, 2011.  NETech does not challenge these particular calculations.

### 1b. Lost profits through September 2011 based on NETech's customers serviced by former CDW employees

As an alternative to calculating lost profits based on overall lost revenue at the Indianapolis branch described above, Mr. Hosfield identifies lost profits "attributable" to customers to whom the recruited employees sold AT products and services while employed by NETech.  In other words, Mr. Hosfield's analysis assumes that the revenue that an employee who formerly worked for CDW generated while working for NETech would have been captured by CDW absent NETech's illegally wrongful conduct.  As discussed in this entry, NETech attacks this assumption as incompatible with applicable law, in part because it seeks to recover damages for customers of CDW-Government and not customers of any of the plaintiffs.

### 1c.  Future lost profits

Mr. Hosfield's future lost profits calculation uses the same underlying data and methodology used to calculate lost profits through September 2011.  That is, he built on the gross AT products and service revenue from 2011 and applied annual growth percentages using the same other-Great Lakes branch yardstick analysis.  He assumed that revenues for the Indianapolis branch would, except for NETech's conduct, grow through 2015 at the same rates he had projected its growth should have been for 2010 and 2011.  He assumed that but for NETech's conduct, the revenues would remain stagnant at the 2010 and 2011 actual levels, although for 2014 and 2015, he reduced damages by 20% and 50%, respectively, "to account for CDW's anticipated ability to recapture market share over time after replacing and training new employees."  He used a 3.25% discount rate to calculate present value.

Mr. Hosfield also explains that a "portion of lost profits . . . are estimated to continue indefinitely."

As addressed in this entry, NETech attacks Mr. Hosfield's opinion on future lost profits as unreliable and speculative, particularly because his assumption that lost profits will extend into the future is grounded in blind acceptance of statements by CDW executives that it will take CDW five to seven years to get the Indianapolis branch to where it was before NETech's actions, or maybe three to five years to replace and train employees and to re-establish CDW's reputation in the marketplace.

**1d.  Future lost profits for NETech's sales to customers of recruited CDW employees**

This damages calculation assumes that CDW should be compensated for profits on any AT products and services sales that their former employees make for NETech into the future. He assumes that they will generate sales for NETech at the same aggregate levels they generated for NETech between March 2010 and September 2011. NETech attacks this opinion as so baseless and speculative that it is unreliable under *Daubert*.

## Legal Framework

Federal Rule of Evidence 702 permits expert testimony—defined as testimony regarding scientific, technical, or other specialized knowledge—if the testimony (a) is given by a person qualified as an expert by his knowledge, skill, experience, training, or education; (b) will assist the trier of fact to understand evidence or determine a fact at issue in the case; and (c) is sufficiently reliable; that is, it is based on "sufficient facts or data," "is the product of reliable principles and methods," and "the witness has applied the principles and methods reliably to the facts of this case."

The court serves as gatekeeper to bar expert testimony that is not sufficiently reliable or relevant to issues in the case, or testimony offered by a person not sufficiently expert in the field of study that his testimony concerns. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993). Determining whether expert testimony is sufficiently reliable for a jury to consider requires a flexible approach, and courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009) (internal citations omitted) (emphasis in original).

NETech does not dispute that Mr. Hosfield has the necessary pedigree and experience to give expert testimony on lost profits damages, but credentials are not enough. As the Seventh Circuit has described, "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert.*" *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009) (internal quotations and citations omitted). It is not a sufficient defense of Mr. Hosfield's opinions to say he is a "seasoned financial analyst" or "has never been disqualified to serve as a damages expert." (CDW Response Brief, Dkt. 272, at pp. 1, 4).

Much of the parties' arguments require the court to determine whether some or all of the assumptions on which Mr. Hosfield's opinions are based are so speculative or unjustified that the opinions generated from them must be excluded under Rule 702. Or, as CDW contends in defense, because Mr. Hosfield's methodology is appropriate (primarily because he used a yardstick methodology), attacks on his assumptions are fodder for cross-examination and not ground for exclusion. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) (the

"soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact").

## Analysis

NETech contends that Mr. Hosfield's lost profits analyses do not satisfy the standards of Rule 702 on four grounds.  First, it argues that Mr. Hosfield was required to, but did not, "independently" verify the data supplied to him by CDW as its Indianapolis branch's "actual" AT service and product revenue, thus making his opinions unreliable.  Second, it attacks Mr. Hosfield's yardstick methodology because it is based only on a presumption that the average revenue growth of a group of other CDW offices is a good proxy for assumed growth of the Indianapolis office.  Third, NETech asserts that Mr. Hosfield grossly overstated the amount of revenue that NETech obtained purportedly because of its illegal acts.  Fourth, it argues that despite clear evidence that any harm to the plaintiffs from NETech's alleged illegal conduct was short term at most, Mr. Hosfield nevertheless assumed that CDW would suffer lost profits into the indefinite future.  The court will address each argument in turn.

### A. Independent Verification of Data

The baseline for Mr. Hosfield's calculation of lost profits for the Indianapolis branch is that branch's "actual" Advanced Technology service and product revenue for 2009.  He projected the amount of AT revenue that the branch should have achieved in 2010 by applying a 23% growth factor for AT service revenue from 2009 to 2010 and a 25% growth factor for AT product revenue from 2009 to 2010.  The 2010 figures became the baseline for projecting 2011 revenue, by applying a 21% growth factor for AT service from 2010 to 2011 and a -1% growth

9

factor for AT products from 2010 to 2011. He subtracted from the 2010 and 2011 projected revenue figures the "actual" Advanced Technology service and product revenue to the branch.

NETech contends that Mr. Hosfield blindly accepted as accurate, and without any verification, the figures supplied to him by CDW as the "actual" AT service and product revenue for 2009 and 2010. It points out that CDW prepared numerous versions of these "actual" figures and the figures vary wildly from one to the other, yet Mr. Hosfield could not explain at his deposition the reasons for the changes in the figures or why versions other than the one he accepted as accurate were not correct. Relying primarily on two cases from this court, NETech argues that an expert can rely on information provided by his client only if he independently verifies the accuracy of the information before using it in his calculations. These cases are *King-Indiana Forge, Inc. v. Millennium Forge, Inc.,* 2009 WL 3187685 (S.D. Ind. Sept. 29, 2009), and *MDG International, Inc. v. Australian Gold, Inc.,* 2009 WL 1916728 (S.D. Ind. June 29, 2009).

The court finds that the circumstances presented in those cases that caused the court to conclude the experts were merely "parroting" unsubstantiated views of their clients are not present here. Mr. Hosfield, and not CDW, determined the type of accounting data he required to make a proper analysis, which was to isolate from CDW's accounting records only Advanced Technology service and product revenue for the Indianapolis branch. Ms. Laura Michel, who is a Senior Sales Compensation Analyst for CDW, was tasked with gathering the necessary accounting data for Mr. Hosfield. As CDW explains, and as the court understands it, CDW tracks revenue by tying services and products revenue to particular salespersons and their association with particular branches.[7] CDW's response brief and an affidavit by Ms. Michel

---

[7] CDW sales associates that sell AT products and services fall into the following categories: an Advanced Technology Account Executive, an Account Executive, an Account Executive II, and an Advanced Technology Field Sales Executive. In addition to Advanced

explain the work she did to isolate for Mr. Hosfield only AT service and product revenue. This was an evolving process. Initially, Ms. Michel did not exclude product revenue for sales of "core" products, *i.e.,* laptops, printers, and monitors that do not involve the services of CDW engineers and thus are not considered by CDW as Advanced Technology revenue. She also had not included Indianapolis branch revenue from healthcare clients because those sales had been recorded to sales managers outside the Indianapolis branch even though Indianapolis branch salespersons had generated the revenue. In addition, for a period of time, CDW used a commission split structure which split revenue between an Advanced Technology Field Sales Executive and an Account Manager (or "AM"), assigning some Advanced Technology revenue to the AM. Ms. Michel initially had not captured revenue assigned to an AM even though it represented Advanced Technology revenue, as Mr. Hosfield had requested.

     Ms. Michel's second iteration of her work excluded sales of core products, included all the AT revenue sold by AEs, AE2s, AEAEs, and FSEs, and added the AT revenue for sales for healthcare accounts. She then determined that for one of the FSEs (Field Sales Executive), his revenue figures included sales of some products that CDW does not consider AT revenue. She revised her spreadsheet, again, to eliminate non-AT revenue so that the data included only AT revenue, as Mr. Hosfield had requested. Next, she realized she had not corrected for the AT revenue that had been assigned to AMs and she had not eliminated all revenue for core products. Ms. Michel fixed these problems, now certain that she had captured all, and only, the AT revenue for the Indianapolis branch. (*See* Michel Affidavit, Dkt. 272-1). This is the "actual" revenue data that Mr. Hosfield used in his analysis.

---

Technology products and services, CDW also sells "core" products which are laptops, printers, or monitors that do not involve the services of CDW engineers, and are not considered by CDW to represent Advanced Technology revenue.

Thus, Mr. Hosfield did not simply accept "off-the-cuff" figures supplied by the client like the experts in *MDG International,* 2009 WL 1916728 (S.D. Ind. 2009) (who, among other things, accepted from his client empirical assumptions that were contradicted by the available evidence), and in *King-Indiana Forge,* 2009 WL 3187685 (S.D. Ind. 2009) (who simply offered his client's conclusion on damages as his own).

The court is not persuaded that Mr. Hosfield was required to do more than he did in relying on CDW—particularly Ms. Michel—to accurately compile from CDW's accounting system the revenue attributable only to AT products and services. The existence of different versions of that data reflecting Ms. Michel's steps to capture the right information (which progressively increased the amount of lost profits) and whether Mr. Hosfield precisely understood the reasons for the changing numbers are matters for cross-examination.[8] NETech can attack the accuracy of this data and CDW can counterattack. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) (soundness of the factual underpinnings of an expert's analysis generally is a factual matter to be determined by the trier of fact).

## B. The Yardsticks

As noted earlier, Mr. Hosfield decided that the Indianapolis office would have—but for NETech's alleged wrongful conduct—grown in AT service and product revenue in 2010 and 2011 at the same mean rates experienced by a group of other CDW branches in the Great Lakes region. These branches are located in Appleton, Milwaukee, Madison, and Wausau, Wisconsin;

---

[8] The fact that Ms. Michel prepared another set of figures—a document that tracked accounts assigned only to former employees Dinkins and Garcia—is also a matter for cross-examination. NETech may argue to the jury that these figures are "a much more specific indicator of any harm attributable to the conduct in this case," were prepared in the ordinary course of business and not for purposes of litigation, are inherently more reliable than the AT revenue data Mr. Hosfield accepted as accurate, and that Mr. Hosfield was never told about these figures and did not consider this information.

Chicago, Illinois; Grand Rapids and Detroit, Michigan; Cincinnati and Cleveland, Ohio; and Minneapolis, Minnesota.

An expert's choice in data sampling is at the heart of his methodology. *Allgood v. General Motors Corp.,* 2006 WL 2669337 at *10 (S.D. Ind. Sept. 18, 2006). A yardstick approach is an acceptably reliable method under *Daubert* for calculating lost profits only if the benchmarks (or yardsticks) are sufficiently comparable that they may be used as accurate predictors of what the target would have done. *See id.* (quoting *Loeffel Steel Prods. V. Delta Brands, Inc.,* 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005)):

> In order for the sampling chosen . . . to have the requisite predictive capacity and the reliability that *Daubert* demands, [the expert] had to 'select samples that are truly comparable. . . . This is often referred to as the 'yardstick approach.' Absent the requisite showing of comparability, a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural. . . . Of course, exact correlation is not necessary but the samples must be fair congeners. If they are not, the comparison is manifestly unreliable and cannot 'logically advance [] a material aspect of the proposing party's case. . . .'

Mr. Hosfield offers no reason why he chose CDW's other branches as appropriately comparable to CDW's Indianapolis branch. In fact, his analysis averages the revenue growth experiences of the other CDW branches, so he does not even compare the Indianapolis branch to the actual experience of any other business entity. It appears that using the average revenue growth experience of the branches, rather than the actual revenue growth or decline of a particular branch, permitted Mr. Hosfield to avoid explaining how another branch's experience in any year (or over time) could appropriately be applied to Indianapolis. The data for individual branches shows wide variations in branch performance from year to year. For example, the Detroit branch suffered a 30% drop in gross revenue from 2008 to 2009, yet by using an average of all branches, Mr. Hosfield's data shows that revenue dropped by only 3% from 2008 to 2009.

Detroit then grew by 60% from 2009 to 2010, but by using an average of all branches, Mr. Hosfield's data shows that revenue grew by 25% from 2009 to 2010.

The sum of Mr. Hosfield's justification for this particular yardstick approach is that "Presumably, since the Indianapolis branch historically grew at rates greater than CDW's other branches, and the other branches grew by 25% in 2010, the Indianapolis branch's AT revenue should have also grown in 2010." Mr. Hosfield made no (and did not rely on any) economic analysis of the Indianapolis market or any other market. CDW defends the use of the "average" of the other CDW branches because the branches are located in the Midwest like the Indianapolis branch, are in the same line of business as is the Indianapolis branch, and operate under the same management structure and policy as the Indianapolis branch. (Dkt. 272 at p. 17). But none of these factors says anything about the market forces that affect (or affected) the revenues of any other branch and whether market forces affected Indianapolis even roughly the same as any other branch. CDW offers nothing—and neither did Mr. Hosfield—to establish comparability of market forces for Indianapolis to another branch or Indianapolis to a hypothetical "average" branch. CDW does not dispute that, as Mr. Hosfield's revenue summary shows, "the cumulative growth of all the included branches does not approximate the growth of any individual branch." (Dkt. 257 at p. 2).[9] The comments of the Fifth Circuit in *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.,* 213 F.3d 198 (5th Cir. 2000), in reversing a lost profits damages award, are apt here:

> One analytical problem and failure of [plaintiff's] proof lies in the fact that *an average of unknowns is also an unknown.* A . . . plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the

---

[9] NETech also points out in its reply brief that the revenue figures also show that changes in year-to-year revenue for the Indianapolis office "never correlated with changes to the aggregate revenue of the other offices before the allegedly improper conduct occurred." (Dkt. 287 at p. 12).

14

> reasonable similarity of the business whose earning experience he would borrow. Here, the only evidence of comparability was that [the plaintiff] owned the other indoor soccer arenas [the benchmarks]. No evidence was offered of the geographical location, size or attractiveness of these facilities, the size and type of the soccer player market that they served, the relative costs of operation, the amounts charged per team, or the number of seasons run. To apply these arenas' average 'rates of return' indiscriminately to [the plaintiff] is like arguing that because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average.

*Id.* at 208-09 (emphasis added).

Moreover, other information analyzed by Mr. Hosfield tends to demonstrate that the revenue growth his analysis predicts CDW would have achieved but for NETech's conduct is way off base. Mr. Hosfield, as an alternative measure of lost profits damages, analyzed the amount of sales that NETech actually made but which should have been made by CDW. The disparity between the revenues Mr. Hosfield calculates CDW would have earned under his yardstick approach versus the alternative NETech sales approach highlights the unreliability of his yardstick model. According to the yardstick model, but for NETech's wrongful conduct, CDW should have earned AT revenue in 2010 of $30,231,756. But when Mr. Hosfield looked at how much revenue NETech actually had earned from customers serviced by the former CDW employees, he determined NETech earned $8,289,697 in 2010 that fairly should be counted as CDW's lost revenue. Mr. Hosfield had no market-based or data-substantiated explanation for the three-fold difference in revenue. He testified that he did not look at any data about market sales and he did not examine whether there was any competitor other than NETech that was growing in the Indianapolis market at the same time that CDW was declining. (*See* Dkt. 257 at pp. 20-21).

The court finds that Mr. Hosfield's lost profits calculations based on his "average" yardstick methodology do not satisfy Rule 702. They are excluded on *Daubert* grounds.[10]

### C. Lost Profits Based on Sales Made by Employees at NETech

As noted above, Mr. Hosfield, created an alternative valuation model in which he identified, through an examination of NETech's records, customer revenue generated by the efforts of former CDW employees while employed by NETech. This model assumes that had NETech not engaged in wrongful conduct, the employees would have remained with CDW and generated that revenue for CDW instead. NETech's motion raises two challenges to this opinion. First, some of the revenue included by Ms. Hosfield is attributable to customers of CDW-Government, which is not a party. The court agrees with NETech that the plaintiffs cannot recover for damages suffered by a non-party. Earlier in this case, the court cited with approval the principle that "a corporation does not 'have independent standing to sue for injuries done to a sister or subsidiary corporation, despite the fact that their businesses are intertwined and the success of one is dependent on that of the other.'" (*See* Dkt. 255 at p. 13, citing *Krier v. Vilione,* 766 N.W.2d 517, 525 (Wis. 2009)). Thus, Mr. Hosfield will not be permitted to testify as to losses for customers of CDW-Government (including healthcare accounts).

NETech also challenges Mr. Hosfield's inclusion in his list of lost customers certain customers that had no relationship with any of the new NETech employees when they worked

---

[10] This finding also eliminates Mr. Hosfield's future lost profits damages that are grounded in his yardstick methodology. The court therefore need not address other challenges by NETech to the future lost profits calculation. It notes, however, that some of NETech's other arguments regarding future lost profits are persuasive, including the unreliability under *Daubert* of Mr. Hosfield's selection of a run-out period to 2015 based on the unsubstantiated say-so of two CDW executives, and his opinion (with no support) that CDW will suffer permanent lost profits every year in perpetuity. (Dkt. 257 at pp. 29-31). *See also Victory Records, Inc. v. Virgin Records America, Inc.,* 2011 WL 382743 at *2 (N.D. Ill. Feb. 3, 2011) (canvassing cases disallowing as unreliable expert testimony grounded in a party's "say-so" projections rather than a statistical or market analysis).

for CDW. It argues that causation, as a matter of law, does not exist between any of the harm it is alleged to have caused and revenue from customers that were never served by CDW. On this matter, the court is not persuaded on the record before it that there is no basis upon which a jury could find, properly instructed, causation between NETech's wrongful conduct and CDW's failure to win the sales the former CDW employees generated for NETech. Neither NETech nor CDW analyzes the causation issue under Indiana or Wisconsin law.[11] For now, the court will not preclude CDW from offering a calculation of lost profits based on NETech's revenue from this category of customers, but it also finds no basis—on the record before it—for permitting Mr. Hosfield to assume causation. Independently of Mr. Hosfield's testimony, CDW must prove at trial facts sufficient for a jury to find causation under the applicable law.

### D. Predicted Future Customer Losses

Mr. Hosfield's customer-centric lost profits analysis also predicts into the future and at least through 2015 that NETech's conduct in 2010 (assuming a jury finds NETech liable to CDW for the alleged conduct) will cause CDW to continue to lose the same level of specific-customer revenue to NETech that it actually lost in 2010 and 2011. The court agrees with NETech that (even adjusting for the CDW-Government customers and perhaps customers that were never served by the employees while working for CDW), Mr. Hosfield's opinion rests on assumptions that are too speculative to meet the reliability requirement under *Daubert*. Mr. Hosfield's assumption that damages will extend into the future and that there is not, and will not be, a level playing field for CDW and NETech to compete is based on the mere say-so of two CDW executives. These executives made the conclusory assertions that it would take five to seven years, or three to five years, for CDW's Indianapolis branch to be in the position it was

---

[11] The court assumes the parties will urge the application of Indiana or Wisconsin law to the claims in this case.

before Spring 2010 and to re-establish CDW's reputation in the marketplace. Mr. Hosfield accepted these opinions at face value without knowing whether they have any evidentiary support. *Fail-Safe, L.L.C. v. A.O. Smith Corp.,* 744 F. Supp. 2d 870 (E.D. Wis. 2010) (excluding expert testimony that "merely parroted" the predictions of the client's executives regarding a product's launch date, future sales, and time to saturate the marketplace). Moreover, his opinion ignores that this court issued an injunction in July 2010 that enjoined NETech from continuing to engage in any of the wrongful conduct upon which CDW bases its claims. When an expert's opinion fails to account for obvious "salient explanatory variables," it is too unreliable for admissibility under Rule 702. *See Target Market Publishing, Inc. v. ADVO, Inc.,* 136 F.3d 1139, 1143-44 (7th Cir. 1998) (rejecting expert opinion resting on implausible assumptions); *King-Indiana Forge,* 2009 WL 3187685 at *3 (quoting *People Who Care v. Rockford Board of Educ.,* 111 F.3d 528, 537-38 (7th Cir. 1997) (study that "'fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court'").

For these reasons, the court excludes Mr. Hosfield's opinion regarding the customer-centric future lost profits.

## Conclusion

NETech's motion (Dkt. 256) to exclude expert testimony by Mark Hosfield is GRANTED IN PART and DENIED IN PART. With respect to lost profits, the court permits only that portion of Mr. Hosfield's analysis and opinion based on actual customer sales by NETech, except that Mr. Hosfield will not be permitted to use revenue for health care accounts that would have been customers of CDW-Government. In addition, proximate cause must be established through evidence independent of Mr. Hosfield's opinions for claimed lost profits

attributable to customers served at NETech by the former CDW employees but which had not been customers of CDW.

    So ORDERED.

Date: 09/28/2012

                                Debra McVicker Lynch
                                United States Magistrate Judge
                                Southern District of Indiana

Distribution to all counsel of record via CM/ECF.