UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CDW LLC, CDW DIRECT LLC, and BERBEE INFORMATION NETWORKS CORPORATION, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.: 1:10-cv-0530-SEB-DML |
| | ) |
| NETECH CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## Report and Recommendation on Plaintiffs' Motion for Summary Judgment

### Introduction

As requested by the district judge (Dkts. 322, 328), the magistrate judge makes this report and recommendation on the motion for summary judgment (Dkt. 282) filed by plaintiffs CDW LLC, CDW Direct LLC, and Berbee Information Networks Corporation, who seek judgment as a matter of law on defendant NETech's counterclaims for tortious interference with business relationships and unfair competition.

The plaintiffs (referred to collectively as "CDW")[1] brought this lawsuit in April 2010 after a number of CDW employees in its Indianapolis office were hired away by defendant NETech.  CDW and NETech are competitors that sell computer technology solution services to businesses.  CDW sought preliminary injunctive relief and in July 2010, the court entered a preliminary injunction that, among

---

[1]    Where necessary, the court will distinguish the plaintiff entities.

other things, regulated NETech's recruitment and hiring of CDW employees and prohibited NETech from retaining and using any confidential information or trade secrets possessed by CDW's former employees who had gone to NETech.  (Dkt. 96).

On December 6, 2010, NETech filed counterclaims (Dkt. 135), claiming that CDW had engaged in conduct—including the filing and prosecution of this lawsuit—that (a) tortiously interfered with "NETech's valuable business relationships with its customers" (*see* Count I, ¶ 35); (b) amounted to unfair competition (Count II); and (c) was an abuse of process (Count III).  At the pleadings stage and applying Rule 12(b)(6), the court dismissed the abuse of process claim (Dkt. 216), which alleged that CDW was pursuing "the pending lawsuit with the ulterior motive of harming and damaging NETech rather than for legitimate purposes."  (Count III, ¶ 43).  The court declined to dismiss the claims for tortious interference with customer relationships and unfair competition, determining that NETech's legal theories were sufficient at the early pleadings juncture.  The court expected that additional development of the case would be necessary to determine whether NETech's remaining counterclaims could survive.  (*E.g.,* Dkt. 216 at pp. 10-11).

NETech's theories for recovery against CDW are largely unchanged from its pleading, though it now contends that CDW wrongfully interfered with NETech's relationships with *employees,* as well as with its customers.  In broad form, NETech contends there is sufficient evidence upon which a jury could determine that:

- CDW tortiously interfered with NETech's hiring of employees by wrongfully using this lawsuit or other means to intimidate employees from leaving CDW and working for NETech.

- CDW tortiously interfered with NETech's business relationship with a customer—Wabash National—through predatory pricing.

- CDW engaged in unfair competition with NETech through predatory pricing.

As discussed in this Order, the court finds that CDW is entitled to judgment as a matter of law on NETech's counterclaims. No reasonable jury, on the evidence now before the court, could determine that CDW engaged in illegal predatory pricing, that it acted illegally in its initiation and pursuit of this lawsuit, or that it acted illegally in its dealings with employees. CDW is therefore entitled to judgment as a matter of law on NETech's counterclaims for tortious interference and unfair competition.

## <u>Summary Judgment Standard</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying the evidence that it believes demonstrates the absence of genuine dispute as to a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The nonmovant must "make a sufficient showing on [each] essential element of her case with respect to which she has the

3

burden of proof," *id.* at 323, by designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will prevent summary judgment. *Liberty Lobby,* 477 U.S. at 248; *JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996).

The court recites this well-known standard primarily to distinguish the court's inquiry at this stage of the case from the inquiry it was obliged to apply at the pleadings stage.  The distinction is particularly important in the analysis of the summary judgment issues presented here.  In contrast to the Rule 12(b)(6) juncture, at which NETech was given the "benefit of imagination" (Dkt. 216, p. 7), NETech must now "put up or shut up" by producing evidence to support the elements of the claims it has asserted.  *See Goodman v. Nat'l Security Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010).

NETech has misapprehended the nature and scope of Judge Barker's Rule 12(b)(6) analysis of CDW's earlier motion.  For example, and as explained more thoroughly below, NETech has emphasized Judge Barker's recognition that "predatory pricing" can constitute unfair competition under Indiana law and also satisfy the "illegality" requirement for a claim of tortious interference with business relationship.  (*See* Dkt. 216 at pp. 7-9.)  But in doing so, NETech has ignored the nature of the *evidence* required to sustain such a claim, which is, of course, the pivotal inquiry for summary judgment purposes.

## Facts

The facts recited below are either undisputed by the parties or are presented in the light most favorable to NETech, the nonmoving party.

### Activities Leading to this and Other Lawsuits

CDW and NETech are direct competitors in the technology solutions business.  (NETech's Answer to Amended Complaint, Dkt. 135, at ¶ 7).  In early 2010, NETech began soliciting numerous CDW employees for employment with NETech.  (Answer, ¶¶ 11, 12).  Through its efforts, NETech hired a total of 17 CDW employees, including CDW's Indianapolis branch manager, its professional services manager, and some salespeople responsible for significant portions of CDW's Midwest sales revenue.  (*Id.*; James Engen Deposition Transcript, Dkt. 270-1, at page 90, lines 3-6).  These employees had signed agreements containing various post-employment obligations to their employer.  (NETech's Counterclaim, Dkt. 135, at ¶ 16).

Upon the employees' resignations from CDW, CDW sent many of them letters referencing their post-employment obligations.  (Counterclaim, ¶ 16).  NETech designated two such letters in opposition to summary judgment.  On April 2, 2010, CDW's counsel sent letters to Ann Garcia and Rick Dinkins that enclosed copies of their employment contracts.  These letters specifically referenced the contracts' 12-month post-employment non-competition provisions and the contracts' prohibition against use of confidential or secret information.  The letters demanded the return of all company information Garcia and Dinkins possessed and demanded they cease

working for NETech for at least the period required by their contracts.  (*See* Dkt. 297-3 (Garcia letter) and Dkt. 297-4 (Dinkins letter)).

CDW later filed this lawsuit and four other state court lawsuits against NETech and some of the departed employees.  (Counterclaim, ¶¶ 18, 19).  The four other lawsuits are:  (1) *CDW Direct LLC, et al. v. Peterson, et al.,* which was filed in Wisconsin state court one day before this lawsuit and was brought against a number of NETech employees who formerly worked for one or another of the plaintiffs; (2) *CDW LLC, et al. v. Lochkovic, et al.,* which was filed in Wisconsin state court against additional former employees of the plaintiffs; (3) *CDW LLC, et al. v. Sanders,* which was filed in Illinois state court against Michael Sanders, a former CDW Direct employee now employed by NETech in its Madison, Wisconsin office; and (4) *CDW LLC et al. v. Bannister,* which was filed in Indiana state court against John Bannister, the former branch manager of CDW's Indianapolis office.

On July 7, 2010, this court granted CDW preliminary injunctive relief based in part on its findings that former CDW employees took CDW's confidential information with them for use at NETech and that CDW had a reasonable likelihood of success on the merits of its claim that covenants not to compete signed by the employees were enforceable and that NETech had tortiously interfered with those contracts.  (Dkt. 96 at pp. 5-7 (regarding the taking of CDW files to NETech) and pp. 12-16 (regarding the non-competition covenants)).[2]  The preliminary

---

[2]     Later in this case, on February 16, 2012, the court ruled that covenants not to compete executed by those employees who originally were employed by plaintiff Berbee (including Garcia and Dinkins) began to run for those who had been

injunction order regulated NETech's future recruitment and hiring of CDW employees and prohibited NETech from retaining and using confidential information or trade secrets possessed by CDW's former employees that left for NETech.  (Dkt. 96 at pp. 24-25).  About a week earlier, on June 30, 2010, a stipulated injunction had been entered in the *Peterson* case in Wisconsin state court.  (*See* NETech's response to summary judgment, Dkt. 294, p. 3).

<u>NETech's Unsuccessful Recruitment Efforts</u>

NETech was not successful in all of its recruitment efforts directed at CDW employees.  In March 2010, NETech received a resume from CDW Direct employee Andrew Short, who was looking for a job.  (Short Deposition Transcript, Dkt. 295-1, at pp. 12-13).  At some point, he agreed to start work for NETech on May 3, 2010, (*id.,* Trans. at p. 58), but about a week before his planned start date, Mr. Short decided not to work for NETech.  (*Id.* at 58-59).  The evidence before the court does not reveal why Mr. Short changed his mind.  Although NETech's brief asserts that Mr. Short chose not to work for NETech because of this lawsuit (Dkt. 294 at p. 3), the pages of the deposition transcript cited to support this statement do not contain testimony from Mr. Short about why he changed his mind.

---

transferred within the CDW family of affiliated companies from Berbee to CDW Direct.  (Dkt. 255).  This meant that for many of the former Berbee/CDW Direct employees who went to work for NETech in the Spring 2010, their non-competition obligations had already expired before they left for NETech.  (*See* Dkt. 277, clarifying the court's summary judgment entry at Dkt. 255).

Similarly, although NETech asserts that another CDW employee, Doug Bobo, wanted to join NETech but chose not to speak with NETech after this lawsuit was filed, NETech does not cite any admissible evidence regarding Mr. Bobo's decision. NETech does point to the testimony of one of its employees (Mark Wierenga) about what Mr. Bobo told Mr. Wierenga (*see* Dkt. 297-1), but Mr. Bobo's alleged statements to Wierenga are hearsay that the court may not consider. *Cortezano v. Salin Bank & Trust Co.,* 680 F.3d 936, 942 (7th Cir. 2012) (inadmissible hearsay is properly disregarded on summary judgment).

CDW employee Scott Tilev had been engaged in hiring discussions with NETech for several months as of July 2010 and, under requirements of this court's July 7, 2010 preliminary injunction order, NETech advised CDW on July 8, 2010, of its plan to hire Mr. Tilev. (Dkt. 297-2). Mr. Tilev's superior at CDW, Eric Nieckula, telephoned Mr. Tilev, told him that he planned to fly to Indianapolis to meet with him, and asked Mr. Tilev if he was going to work for NETech. Mr. Tilev told him no. (Tilev Deposition Transcript, Dkt. 295-2, at p. 36). Mr. Nieckula asked Mr. Tilev to notify NETech of his decline of NETech's offer of employment, and Mr. Tilev obliged and sent an email to NETech. (Dkt. 295-3). Mr. Tilev surmised "just based on the activity that was taking place between [CDW and NETech]" that if he had admitted he was considering working for NETech, CDW would have terminated his employment. But he did not base his view on any articulated threat or on the actual experience of any other employee. (*Id.* at p. 37.)

8

More than a year after this suit was filed, in June 2011, CDW employee Kyle Payne accepted an offer of employment from NETech.  CDW learned that Mr. Payne had decided to leave and tried to convince him to stay.  CDW's efforts included his supervisor having a lengthy (nearly two hours long) telephone conference with him, giving him a copy of this court's preliminary injunction order, and offering him more money than NETech had offered.  (Dave Flynn Deposition Transcript, Dkt. 295-15, at pp. 188-191, 197).  His supervisor and a co-worker also told Mr. Payne how much they respected him, that they believed him to be a valuable member of the team, and that they hoped he would stay with CDW.  (Dkt. 295-16 at p. CDW0293547).  CDW understood from Mr. Payne that a matching financial offer from CDW would not be enough incentive for him to stay with CDW; so, CDW sweetened its financial offer to Mr. Payne.  (Flynn Trans., Dkt. 295-15, at pp. 194-195).  Mr. Payne declined to leave CDW for NETech (*id.* at p. 193).

The Lawsuit's Effect on NETech's Business

In opposition to CDW's motion for summary judgment on NETech's counterclaims, NETech relies on the following materials as evidence that CDW filed and has pursued this litigation for "improper" purposes.  In November 2010, Chris Gardner, who had become the acting branch manager for CDW's Indianapolis office, sent an email to some of his salespeople documenting accounts and business that CDW had lost to NETech since the "exodus" earlier in 2010.  In it, he sought additional information the salespeople might have about other business lost to NETech.  One of the recipients, Chris Warren, wrote back with a list of additional

9

business that he believed NETech was going after and expressed his view that the

Indianapolis office needed staffing, not lawsuits, to compete effectively with

NETech:

> Honestly it would be nice to feel like we have executive support for our
> own issues such as staffing (engineers, presales).  Give us the
> opportunity to compete on our own accord vs. going after Netech
> legally.  This is frustrating.  We're better than they are so let us prove
> it.

(Dkt. 295-11).  Mr. Gardner, the Indianapolis branch manager, responded that

"They're trying to slow them down to continue to give us time to rebuild/evolve.  I

agree though that we are better and have a lot more to sell and ultimately that's

how we'll win."  (*Id.*).

About this same time, in November 2010, it appeared to CDW that it was

losing business to install Cisco technology for a customer named Maui Jim.  Cisco

told Chris Gardner of CDW that the Maui Jim opportunity was "exclusive to Cisco"

because CDW had not done enough work on the Maui Jim opportunity for Cisco to

partner with CDW on the deal.  (November 15, 2010 email from Toby Pearcy of

Cisco to Chris Gardner of CDW, Dkt. 295-12, at p. CDWE0160013).  Gardner was

upset because he thought CDW had led the sales efforts for this opportunity and

reported to his CDW colleagues that "we'll make the call on how high we want to

take this and how many pounds of flesh we want."  (*Id.* at p. CDWE0160012).

About a month later, a CDW account executive met with Pearcy of Cisco and

reported to Chris Gardner that they had "buried the hatchet," and that from a

manufacturing standpoint, there was still an opportunity to fight for the Maui Jim

business.  (Dkt. 295-13 at p. CDWE0164189).  Chris Gardner—referring to a motion CDW filed in this court on December 17, 2010, that challenged NETech's efforts to gain the Maui Jim business[3]—responded that "I just threw a monkey wrench into that this morning for our friends.  It's nice to have a staff of lawyers at your disposal."  (*Id.* at CDWE0164188).  Later, one of the Indianapolis salespeople (Andrew Short) reported to Mr. Gardner that NETech's responsive filing indicated that Toby Pearcy of Cisco may have "walked" the Maui Jim business to NETech.  Mr. Short wished they could ask Toby Pearcy if NETech's claims were true, and he told Gardner that CDW needed to stay in touch with Maui Jim to grab the business when NETech faltered in getting the job done.  He also said:  "I say we go into Maui Jim again and buy the deal right out from under them.  I'll place phones, spin disks, and train users for nothing."  (January 11, 2011 email, Dkt. 295-14, at CDWE0164269).

 CDW's Price Competition with NETech

CDW vied to win customers for which it and NETech competed by sweetening the financial terms it ordinarily offered customers.  CDW was willing to offer special

---

[3]      CDW stated in its December 17, 2010 motion that it had cause to believe that NETech had used CDW's confidential information to make a sale to Maui Jim. Former CDW/current NETech salesmen Doug Risk had worked on the Maui account at CDW for two years. When former CDW/current NETech salesperson Ann Garcia won the account for NETech, CDW inferred that Doug Risk must have inappropriately shared CDW confidential information with Garcia for her use to win the account.  (Dkt. 138).  NETech's opposition to the motion contradicted CDW's inference.  NETech presented evidence that Cisco, the manufacturer, and not NETech or CDW, landed the Maui Jim account.  It was Cisco that gave Maui Jim a list of Cisco partners that Maui Jim could work with for installation and, from that list, Maui Jim chose NETech.  (Dkt. 142 at p. 4).

price discounts on products and services for customers that it was competing with NETech to obtain, and at least one CDW sales person referred to this circumstance as "Netech competitive pricing." (September 24, 2010 email, Dkt. 295-4 at CDWE0181506). Another CDW sales person described that there was an extra 5% funding available when competing with NETech: "We feel we need to use the 5% funding for this [NETech competition] opportunity due to the situation. 5% below cost, we are brought back to 5% on the sales side." (September 23, 2010 email, Dkt. 295-5 at CDWE0161311).

NETech asserts that CDW won a piece of business from customer Wabash National by using the "NETech competitive pricing." A CDW employee confirmed that the "5 pt. competitive program" was used, and "[t]his is the first Wabash deal we took below cost because we are in a competitive situation with Netech." (September 16, 2010 email, Dkt. 295-19 at CDWE0305930). NETech does not contend that it lost any other business to CDW because of the "competitive pricing."

CDW's witnesses maintain that CDW did not sell products or services to customers below cost, once various rebates and volume discounts are factored in (Declaration of Charles Schmitt, Dkt. 266-8, at ¶¶ 4-7). CDW also maintains that, in any event, the price discounts it offered to Wabash National (as well as to two other customers, Parkview Hospital and Butler University) were made to gain a competitive edge and increase business during a time that CDW was attempting to retain and re-grow its market share and the profits it had lost when many of its

employees left CDW.  (*Id.;* Christopher Gardner Deposition Transcript, Dkt. 270-6, at page 93, line 14 to page 95, line 2).

## Analysis

As explained above, CDW seeks judgment as a matter of law on NETech's two remaining counterclaims:  tortious interference with business relationship and unfair competition.  The former claim is based on two factual predicates, each of which will be analyzed separately—that CDW interfered with NETech's relationships with prospective employees and that it interfered with its customers. For those claims, Indiana law requires proof that CDW engaged in some "independent illegal action," so the analysis of the summary judgment issues will begin with an examination of the contours of "illegal action" and then progress to consideration of the evidence NETech has proffered in support of those claims.

In analyzing these claims, the court must address a theme NETech has woven throughout its arguments:  that CDW has filed or pursued this lawsuit primarily to harm NETech.  Its arguments on these matters are misdirected.  First, NETech has not tied its evidence that CDW improperly pursued this litigation to any particular injury it claims to have suffered.  NETech designated evidence regarding two CDW employees who declined NETech's employment offers, but it has not presented any evidence that CDW's alleged improper litigation conduct interfered with NETech's hiring of these employees.  Similarly, NETech identified only one business relationship that it lost to CDW—a deal for Wabash National— but did not show that it used litigation to interfere with NETech's acquisition of

that business.  Second, NETech appears simply to be trying to revive its abuse of process claim, but that claim was dismissed as insufficient under Indiana law, and there is no argument that the court was wrong or that it should revisit that ruling. The court will therefore address NETech's arguments about CDW's litigation conduct only if NETech has causally connected it to its remaining claims.

**I.     CDW is entitled to judgment as a matter of law on NETech's claims that CDW tortiously interfered with employee relationships.**

    **A.  Indiana law requires evidence that CDW engaged in illegal conduct.**

A claim for tortious interference with business relations requires proof of: (1) the existence of a valid business relationship between the plaintiff and another; (2) the defendant's knowledge of the relationship; (3) the defendant's taking action to intentionally interfere with the relationship; (4) the absence of justification for the defendant's action; and (5) damages resulting from the defendant's wrongful interference.  *Melton v. Ousley,* 925 N.E.2d 430, 435-36 (Ind. Ct. App. 2010).  In addition, illegal conduct by the defendant is an essential element of the tort; the plaintiff must prove that the defendant engaged in "some independent illegal action" in achieving his end.  *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.,* 796 N.E.2d 286, 291 (Ind. 2003); *Melton,* 925 N.E.2d at 436 (Ind. Ct. App. 2010); *Watson Rural Water Co., Inc. v. Indiana Cities Water Corp.,* 540 N.E.2d 131, 139 (Ind. Ct. App. 1989) ("In the State of Indiana, an element necessary to prove this cause of action is that a defendant acted illegally in achieving his end.")

The illegal conduct element is what distinguishes this tort from tortious interference with a contract.  The two torts otherwise share the same elements:   a tortfeasor, knowing that a third party has a valid and enforceable *contract* with the plaintiff, acts without justification to cause the third party to breach his contract with the plaintiff.  *Levee v. Beeching,* 729 N.E.2d 215, 221 and 222 (Ind. Ct. App. 2000) (describing elements of both torts).  Thus, the court must be mindful to require evidence of illegal conduct, lest it afford a plaintiff's mere *prospective* contractual relationships the same protections as its actual contracts.  *E.g., Levee,* 729 N.E.2d at 221, 223 (affirming trial court's denial of summary judgment on plaintiff's claim for tortious interference with contract but granting summary judgment on claim for tortious interference with business relationship; both claims relied on the same underlying conduct by the tortfeasor); *Bradley v. Hall,* 720 N.E.2d 747, 751 n.3 (Ind. Ct. App. 1999) (although no court has defined the meaning of "illegal" for this tort, interference with business relations "requires more blameworthy means be used than does interference with contractual relations").

Indiana law on the type and gravity of conduct that will satisfy the "illegality" element of this tort is not well-developed.  Nearly all the cases have been decided on motions to dismiss and because of that procedural posture, guidance on what can constitute "illegal" conduct is virtually nonexistent.  Courts have determined, however, that violation of a criminal statute is not a necessary predicate for proving illegal conduct, *e.g., Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 641-42 (7th Cir. 1999) (citing cases), and that violation of a civil

15

statutory duty probably suffices.  *See id.* at 641 (declining to dismiss claim for tortious interference with business relationship where alleged illegal conduct was violation of the Federal Trademark Dilution Act); *United States v. FKW, Inc.,* 997 F. Supp. 1143, 1153 (S.D. Ind. 1998) (declining to dismiss claim where alleged illegal conduct was violation of the Federal False Claims Act).  At the same time, a defendant's commission of an intentional common law tort may not be enough to satisfy the illegality element.  For example, the Indiana Court of Appeals has stated (though without analysis) that defamation is not illegal conduct for purposes of a tortious interference claim.  *Levee v. Beeching,* 729 N.E.2d 215, 222-23 (Ind. Ct. App. 2000) ("Despite the lack of a definition or test for a showing of the 'illegal conduct' element . . . , case law does not support a finding that defamation constitutes illegal conduct.")   But in *Reginald Martin Agency, Inc. v. Conseco Medical Ins. Co.,* 388 F.Supp.2d 919, 931-32 (S.D. Ind. 2005), this court, while noting the absence of guidance on the illegality element, ruled that proof of common law fraud can satisfy the illegal conduct element.

*Associates Financial Services Co., Inc. v. Bowman, Heintz, Boscia & Vician, P.C.,* 2001 WL 619381 (S.D. Ind. 2001), as Judge Barker noted in this case, "left open the possibility that filing a lawsuit for allegedly improper purposes could amount to 'illegal' conduct sufficient to support a tortious interference claim."  (Dkt. 216, p. 11).  *Bowman* was an action between a client (Associates) and its former law firm, which had regularly pursued debt collection suits for Associates.  Associates filed a complaint accusing the law firm of a range of unethical practices and then

16

anonymously mailed copies of its complaint to other clients of the law firm for whom the firm also pursued debt collection suits.  The law firm counterclaimed that Associates' actions—filing a complaint containing allegedly spurious allegations impugning the law firm's ethics and mailing the complaint to the firm's "business associates in an attempt to smear and ruin [the lawyers'] business reputations and to intimidate and exert economic duress on them"—constituted tortious interference with the firm's business relationships with its other clients.  Associates moved to dismiss the counterclaim for lack of the illegal conduct element.  The *Bowman* court found no Indiana cases deciding whether filing a lawsuit for alleged improper reasons could suffice as illegal conduct, and it allowed the claim to stand at the pleadings stage because "it is difficult to tell from the limited facts whether Associates' alleged conduct was sufficient to be considered 'illegal.'"  2001 WL 619381 at *8.[4]

        In her earlier order denying CDW's motion to dismiss NETech's claim that CDW had tortiously interfered with NETech's business relationships with customers, Judge Barker followed the same rationale as the *Bowman* court.  She determined that the allegation that CDW had filed a lawsuit for allegedly improper purposes was, as in *Bowman,* a sufficient basis to "decline to dismiss NETech's claim at this early juncture, before the parties have had sufficient opportunity to develop facts illuminating the issue of the legality of CDW's actions."  (Order, Dkt. 216, at p. 10).  The court stated, however, in the context of the "justification"

---

[4]        Unlike this court, the *Bowman* court also let stand the law firm's abuse of process claim.  2001 WL 619381 at *10.

element of tortious interference, that NETech would at least be required to prove the absence of a legitimate purpose for the lawsuit and that its pursuit was primarily directed at injuring NETech.  (*Id.* at pp. 10-11.)

One other decision from this district has examined whether an "improper" lawsuit can satisfy the illegal conduct element.  In *Square D Co. v. Breakers Unlimited, Inc.,* 2009 WL 1407017 (S.D. Ind. 2009), the court ruled on summary judgment that if a lawsuit is not frivolous, then its filing and prosecution "cannot form the basis of a tortious interference claim under Indiana law."  *Id.* at *2.  The court explained that whether better analyzed under the justification or illegal conduct prong of a tortious interference claim, when a person has a legitimate legal claim, he is justified in pursuing it, even if the lawsuit may interfere with his competitor's business relationships.  *Id.*  The court further noted that causes of action for redressing improper lawsuits—actions for malicious prosecution and for abuse of process—already exist, and that at least one state has limited claims for wrongful lawsuits to these torts.  *Id.* n. 2 (citing *Havoco v. America, Ltd. v. Hollobow,* 702 F.3d 643, 647 (7th Cir. 1983) (applying Illinois law).  *See also Kentner v. Timothy R. Downey Ins., Inc.,* 2006 WL 2669468 at *11 (S.D. Ind. Sept. 18, 2006) (claim for tortious interference with business relationships was grounded in the opposing party's alleged abuse of process in conducting non-party discovery in litigation; because the plaintiff's actions did not amount to abuse of process, there was no basis for finding his actions illegal to support a tortious interference claim).

The teaching of these cases leads this magistrate judge to conclude that the illegal conduct element of a tortious interference with business relationships claim must *at the very least* constitute activity that is unlawful under federal statutes that govern the accused party, or that the Indiana legislature by its criminal or civil statutes, or that Indiana, through the development of its common law, has declared to be unlawful.

With this background regarding the illegal conduct element, the court now turns to NETech's contention that there is sufficient evidence upon which a jury could decide that CDW acted illegally in interfering with NETech's hiring of CDW employees.

**B. NETech's assertion that CDW engaged in illegal conduct in interfering with NETech's business relationships with CDW employees lacks any evidentiary support.**

    1. <u>This is not a new claim outside the pleadings.</u>

As an initial matter, the court addresses CDW's argument that NETech cannot pursue a claim for tortious interference with *employment* relationships because its counterclaim alleges interference by CDW only with "NETech's valuable business relationships with customers and prospective customers." (CDW Reply Brief, Dkt. 299, at pp. 3-4). In its briefing on CDW's motion to dismiss NETech's counterclaims, NETech described its abuse of process claim as encompassing the harm that CDW has "used the pending lawsuit against former employees as a means of harassing and intimidating Plaintiffs' current employees that wish to work at NETech thereby causing economic harm to NETech and preventing fair

competition." (Dkt. 143 at p. 10). The abuse of process claim was, as noted, dismissed at the pleadings stage. (Dkt. 216 at pp. 11-14). CDW argues that NETech cannot now call that same conduct tortious interference because to do so would skirt the dismissal order and unfairly introduce new legal claims in a summary judgment response brief. *See Berry v. Chicago Transit Auth.,* 618 F.3d 688, 693 (7th Cir. 2010) (party could not introduce a new claim in her brief opposing summary judgment when the claim, as she conceded, was not part of her complaint).

The magistrate judge is not convinced that this claim is new. First, a party is not required to package the factual allegations of its complaint neatly into legal theories. *See Hatmaker v. Memorial Medical Center,* 619 F.3d 741, 743 (7th Cir. 2010) (complaint must plead facts sufficient to show case is plausible, but is not required to plead legal theories). Second, although the parties did not litigate nor did the court decide in connection with CDW's motion to dismiss whether the facts alleged could support a legal theory of tortious interference with employment relationships, NETech made clear in discovery that its contention that CDW interfered with business relationships specifically included CDW having "hindered [NETech] from being able to find employees that want to come work for NETech." (Deposition of Mark Wierenga, Dkt. 297-1, Transcript at pp. 14-15). Under these circumstances, CDW could have and should have addressed NETech's contention in its initial summary judgment brief; it instead waited until its reply brief to argue that NETech's disclosure of this theory in discovery was too late. The court will

therefore address on the merits whether there is sufficient evidence for trial on this claim.

2.  **Even if CDW's prosecution of litigation satisfies the "illegality" requirement, it must have actually interfered with an identifiable employee relationship.**

NETech has presented admissible evidence that two CDW employees—Scott Tilev and Kyle Payne—turned down job offers made by NETech after CDW learned of the offers and talked to those employees about the offers.[5]  But before addressing this evidence and whether it is sufficient to present the claim to the jury in light of the substantive law, the court first addresses NETech's broadbrush argument that CDW's alleged improper pursuit of this lawsuit affected NETech's business relationships with employees *in general*.  In this vein, NETech cites evidence that CDW's counsel sent letters to former employees Garcia and Dinkins asserting, among other things, that their employment by NETech violated their non-compete agreements.  NETech also states that CDW has pursued four other lawsuits against NETech or former CDW employees in state court.

NETech argues that the pre-lawsuit letters to Garcia and Dinkins help to show that this lawsuit was and is being pursued by CDW for an improper purpose

---

[5]  As discussed in the facts section of this Order, *supra* pp. 7-8, NETech did not support with admissible evidence its contention that CDW employees Andrew Short or Doug Bobo turned down a job offer from NETech or refused to speak to NETech because of any specific conduct by CDW.  As to Mr. Short, his designated deposition testimony at best establishes that he received an email from CDW's CEO at about the same time he told NETech he decided not to join NETech's employ, but there is no evidence of the contents of the email.  (*See* Short Deposition Transcript, Dkt. 295-1, at pp. 58-59.)  NETech designated no admissible evidence with respect to Mr. Bobo.

of intimidating employees.  It bases its assertion on this court's determination in February 2012 that Garcia's and Dinkins's employment agreements, including non-competition covenants, had expired before they left CDW's employ for NETech.  (*See* Order Granting Defendant's Motion for Partial Summary Judgment, Dkt. 255).[6] NETech contests CDW's evidence that its management had reasonable and legitimate grounds to assert that the non-competition provisions had not expired while Garcia and Dinkins still worked for CDW entities.  But the court need not tarry with this dispute because it does not concern a material fact.  NETech has no evidence that any legal wrangling over the termination of Garcia's and Dinkins's employment contracts, or CDW's pre-lawsuit letters to Garcia and Dinkins, interfered with NETech's business relationship with any particular CDW employee. NETech does not claim that its relationships with Garcia and Dinkins were interfered with,[7] and at most suggests it was hindered generally in efforts to attract CDW employees to its staff.

---

[6]     As explained in the February 2012 Order, Garcia and Dinkins originally were employed by, and their non-competition agreements had been entered with, a Wisconsin company—Berbee Wisconsin—that was later merged with a CDW entity. After joining the CDW family, Garcia and Dinkins were assigned to work for CDW Direct, but their employment agreements with Berbee Wisconsin (which became CDW Berbee) were never assigned or otherwise transferred to CDW Direct and they never signed new agreements with CDW Direct.  The court ruled that neither CDW Direct nor CDW LLC (the parent company) could enforce the agreements of CDW Berbee *and* that the employment assignment of Garcia and Dinkins to CDW Direct in July 2008 was an effective termination of their employment by CDW Berbee, triggering the running of their post-employment non-competition periods. (Dkt. 255 at pp. 12-16).

[7]     NETech probably does not make this claim because Garcia and Dinkins previously told the court that they did not consider the contracts' restrictions

Tortious interference requires the identity of a valid, existing, business relationship between NETech and someone else. *See Melton,* 925 N.E.2d at 435 (an essential element is the existence of a valid business relationship that the defendant knew about).  In *Brazauskas,* the Indiana Supreme Court rejected as waived a litigant's complaint that the defendants' tortious conduct interfered with her ability to obtain employment with a general class of *potential* employers (all other Parishes or Catholic institutions in a Diocese) because there was no evidence that "she sought or was denied any such positions."  796 N.E.2d at 286 n.3.  *See also Shank v. William R. Hague, Inc.,* 192 F.3d 675, 690 (7th Cir. 1999) (addressing the tort as described in the Restatement (Second) of Torts § 766B: "[I]t only makes sense that to subject a party to liability for allegedly interfering with a prospective relationship, that relationship between the plaintiff and the third party ought to be sufficiently concrete and definite.")  NETech's claim for tortious interference with employment relationships can survive summary judgment only with respect to identified employees as to whom NETech has evidence that CDW interfered by illegal conduct.

### 3. CDW's conduct aimed at retaining Scott Tilev and Kyle Payne cannot satisfy the "illegality" requirement.

The court now turns to the evidence regarding Mr. Tilev and Mr. Payne.  As explained below, there is no evidence in either instance that CDW took action that a jury reasonably could find is illegal.

---

enforceable, and they continued to work for NETech.  (*See* February 2012 Order on summary judgment, Dkt. 255, at p. 5.)

(a)   Scott Tilev

Mr. Tilev's superior at CDW learned in July 2010 that Mr. Tilev had an offer from NETech, called to ask him about it, and said he was flying in the next day to speak in person with Mr. Tilev.  Over the phone, the executive pointedly asked Tilev whether he was going to work for NETech.  Tilev felt "intimidated" and he answered no; he knew that CDW and NETech were engaged in battle and he thought a yes answer would get him fired.  He also agreed immediately to advise NETech that he did not wish to work for it, presumably because he also felt "intimidated" to comply with a superior's request.  Whatever the natural, nervous feelings of an employee whose employer confronts him about his plans to leave for a competitor, NETech must present evidence that CDW's action to thwart NETech's efforts to hire Mr. Tilev were illegal in some fashion.

NETech does not identify any independent legal wrong in connection with CDW's conduct as to Mr. Tilev.  NETech does not assert, and the court can discern no basis for finding, that the conduct fits the elements of any particular tort, or violates any duties circumscribed by any particular civil or criminal statutes.  Mr. Tilev's feelings of "intimidation," or even CDW's intentional intimidation of Mr. Tilev are insufficient to support a finding of tortious interference.  Moreover, as Mr. Tilev explained, he was intimidated because the harm he believed would come to him was being fired by CDW.  Though CDW's conduct can be characterized fairly as heavy-handed, the court has no basis—legal or factual—for denominating it illegal.

**(b)   Kyle Payne**

The lack of evidence that CDW engaged in illegal conduct to dissuade Kyle Payne from joining NETech is even more striking.  The evidence shows that Mr. Payne accepted an offer of employment from NETech in June 2011.  Upon learning of Mr. Payne's decision to leave for NETech, CDW assured Mr. Payne that it appreciated his work and valued him as a leader, raised his salary, and made him a better financial offer than NETech had made.  NETech points to the fact that CDW also gave Mr. Payne a copy of this court's preliminary injunction order, but the court sees nothing independently illegal about that, even if CDW's motive was to allow Mr. Payne to read unflattering descriptions of NETech's conduct and that of his former co-workers to persuade Mr. Payne not to join NETech.  Moreover, the filing of this lawsuit in April 2010, which NETech has also labeled illegal, or the fact that the court granted preliminary injunctive relief in July 2010, could not have been factors that dissuaded Mr. Payne from dealing with NETech since he, in fact, accepted an offer from NETech about a year later.

In sum, as to Mr. Payne, it seems to the court that CDW did what employers often do to change the mind of a valued employee about quitting and joining a competitor—express appreciation, offer more money, and persuade that it's a better place to work than the competition.[8]  This surely is not illegal conduct and is, indeed, procompetitive from a public policy standpoint.

---

[8]     Indiana's appellate courts are firm that defamatory statements about the competition—though NETech does not attempt to prove there were any—do not

Thus, the magistrate judge concludes that NETech has failed to present evidence upon which a reasonable jury could find CDW engaged in illegal conduct in dissuading Mr. Payne or Mr. Short from leaving CDW for NETech.

II.     **CDW is entitled to summary judgment on NETech's tortious interference with customer claim and its unfair competition claim because NETech lacks the evidence necessary to support a finding of predatory pricing.**

NETech has identified one customer—Wabash National—it lost to CDW because of its alleged tortious interference through "illegal conduct."[9]  NETech contends that, based on the evidence, a jury could determine that CDW engaged in illegal conduct by selling to Wabash National at "below cost" predatory pricing. NETech relies on this same evidence of alleged predatory pricing to support its claim that CDW engaged in unfair competition in winning the Wabash National deal.  (*See* NETech response brief, Dkt. 294, at p. 10).  Stated another way, NETech urges that a reasonable jury could conclude from the evidence presented that CDW is guilty of unfair competition through predatory pricing and that predatory pricing satisfies the illegal conduct element of its tortious interference with business relationships claim.  The court need not examine further the latter assertion—that predatory pricing would satisfy the illegal conduct required to hold CDW liable for tortious interference with NETech's relationship with Wabash National.  The

_____

satisfy the illegal conduct element.  *Levee v. Beeching,* 729 N.E.2d 215, 222-23 (Ind. Ct. App. 2000)).

[9]     NETech has also cited a CDW salesperson's statement that he wanted to win a deal for Maui Jim and was willing to provide some services "for nothing" in order to do that, but NETech does not base any claims against CDW on losing the Maui Jim business.

parties and the court agree that predatory pricing—a violation of federal antitrust law and actionable under Indiana law as unfair competition—satisfies the illegality requirement.  *See Miles Distributors, Inc. v. Specialty Const. Brands, Inc.,* **476 F.3d 442, 452-53 (7th Cir. 2007) (the plaintiff's federal antitrust claim could supply the illegal conduct element of its Indiana state law tortious interference with business relations claims; because the antitrust claim failed, district court properly granted summary judgment on state law claim too).**

The question, rather, is whether NETech has evidence to enable a reasonable jury to conclude that CDW engaged in predatory pricing.  The evidence NETech has cited in opposition to summary judgment falls far short of what is necessary to sustain a claim of predatory pricing.

### A.  Predatory pricing requires proof of injury to competition in the long run and not simply injury to a competitor.

As Judge Barker discussed in her order denying CDW's motion to dismiss, the Indiana Court of Appeals determined in *Bartholomew County Beverage Co., Inc. v. Barco Beverage Corp.*, **524 N.E.2d 353 (Ind. Ct. App. 1988), that predatory pricing as defined under federal antitrust law is considered unfair competition for purposes of an Indiana common law claim.**  *Barco* **was an action between competing beer wholesalers.  The plaintiff, Barco, had a franchise from Miller Brewing company to sell Miller Lite beer to retailers, and the brewer assigned the Bartholomew County, Indiana territory as Barco's primary area of responsibility.  524 N.E.2d at 354. Over time, Barco had gained 72 of the 75 Miller Lite accounts in Bartholomew County, which accounted for nearly 70% of Barco's total business.  The defendant,**

Bartholomew County Beverage, also sold Miller Lite at wholesale, and engaged in efforts to win Barco's Miller Lite accounts.  It first offered to sell Miller Lite to Barco's customers at a 5 cent discount from Barco's price.  When that pricing strategy did not win accounts, Bartholomew Beverage "drastically" dropped its prices and offered to sell each case of Miller Lite for $6.90 to all customers in Bartholomew County, while it maintained a price of $8.90 per case to all its customers outside Bartholomew County.  Barco was forced to meet this drastically low price or lose its customers and consequently its Miller Lite franchise.  *Id.*  Price discrimination among customers was prohibited by an Indiana alcoholic beverage statute, and Barco sued Bartholomew Beverage based on its violation of the statute and for having damaged Barco's business as a result.

On appeal from a jury's verdict in favor of Barco, the court first determined that Barco had a private right of action to enforce the anti-price discrimination statute.  *Id.* at 356-58.  It then ruled that even if Barco could not recover damages based on the statutory violation, its common law claim for unfair competition could be based on predatory pricing, as defined under federal law.  *Id.* at 358. The *Barco* court reasoned:

> With regard to price cutting, although price cutting generally is considered a fair and welcomed part of vibrant competition, if prices are cut for the primary purpose of destroying a competing business then the price cutting is considered unfair competition.  *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117-118, 107 S.Ct. 484, 493, 93 L.Ed. 427, 440. . . This form of unfair competition has been termed 'predatory pricing', and was defined and examined by the United States Supreme Court in *Cargill,* as follows:

> 'Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run.  It is a practice that harms both competitors and competition.  In contrast to price cutting aimed simply at increasing market share, predatory pricing has as its aim the elimination of competition.  Predatory pricing is thus a practice 'inimical to the purposes of [the antitrust] laws.'  *Brunswick [Corp. v. Pueblo Bowl-O-Mat, Inc.],* 429 U.S. [477], at 488, 97 S.Ct. [690], at 697 [50 L.Ed.2d 701 (1977)], and one capable of inflicting antitrust injury.'  *Cargill,* 479 U.S. at 117-118, 107 S.Ct. at 493, 93 L.Ed.2d at 440.

524 N.E.2d at 358-59.

In opposing summary judgment, NETech asserts that an antitrust claim provides "the requisite illegal conduct for purposes of a tortious interference claim" and that the evidence establishes "NETech's below-cost pricing claim."  Dkt. 294 at p. 13.  The intent, apparently, is to suggest an inference that mere below-cost pricing aimed at harming a competitor violates the antitrust laws.  But NETech has tried to strip from the term "below-cost pricing" all the requirements that accompany it.  "Below-cost pricing"—in Judge Barker's order and in *Barco*—is simply shorthand for predatory pricing under the antitrust laws.  NETech has ignored the United States Supreme Court decisions (quoted above) that Judge Barker and the *Barco* court cited, which define the very exacting nature of proof required to prevail on a predatory pricing claim.  *See* Dkt. 216 at 8 (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117 (1986)); *Barco*, 524 N.E.2d at 358-59 (quoting *Cargill* and *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)).

The Seventh Circuit has further described the nature of this proof and the exceedingly rare circumstances under which predatory pricing can be established. As it explained in *Wallace v. International Business Machines Corp.*, 467 F.3d 1104, 1106-07 (7th Cir. 2006) (citations omitted):

> Predatory pricing is a three-stage process: Low prices, followed by the exit of producers who can no longer make a profit, followed by monopoly prices. The law's worry is the final period in which the survivor (or cartel of survivors) recoups losses incurred during the low-price period. When exit does not occur, or recoupment is improbable even if some producers give up the market, there is no antitrust problem. . . . Either prices will stay low (reflecting efficient production and enduring benefits to consumers) or the practice will be self-deterring (because the predator loses more during the low-price period than it gains later, and consumers are net beneficiaries). When monopoly does not ensue, low prices remain-and the goal of antitrust law is to use rivalry to keep prices low for consumers' benefit. Employing antitrust law to drive prices up would turn the Sherman Act on its head.

In another decision, our court of appeals has emphasized that "the plaintiff must establish not only that the defendant has sold products below cost but also that exit from the market has occurred or is imminent, enabling the aggressor to recoup by setting monopoly prices that injure consumers." *R. J. Reynolds Tobacco Co. v. Cigarettes Cheaper!,* 462 F.3d 690, 695-96 (7th Cir. 2006).

The *Barco* court also recognized the importance of showing that the defendant had sufficient market power and the ability to exclude competitors, such that pricing below some "appropriate measure of cost" could have the effect of "eliminating competitors in the short run and reducing competition in the long run." 524 N.E.2d at 359 (describing instructions to jury on predatory pricing issue).

NETech clearly has not acknowledged these legal requirements.  Instead, its opposition to summary judgment proceeds on the premise that if it has evidence that CDW charged prices below its costs and did so with the intent of harming NETech's business, a jury can find it liable, based on Judge Barker's order, for unfair competition and tortious interference.  But the order on CDW's motion to dismiss did not create some other new cause of action under Indiana law.  It merely gave NETech the "benefit of imagination" on its predatory pricing claim and determined that predatory pricing, if proven, would support claims of tortious interference with customers and unfair competition.  (*See* Dkt. 216 at p. 7-9 and n. 3.)  For NETech to avoid summary judgment on these claims, it must therefore point to evidence required to sustain a predatory pricing claim under the applicable federal law.

> **B. The evidence that CDW offered below cost pricing to certain customers with the intent to harm NETech is inadequate to support a predatory pricing claim.**

After conducting discovery, NETech has identified only one customer account—a piece of business for Wabash National—that it contends it lost to one of the plaintiffs as a result of "below cost" pricing aimed at destroying it as a competitor.

The evidence shows that CDW introduced a "5 point" NETech competitive pricing program which, depending on rebates and other manufacturing discounts, may or may not have brought pricing below CDW's "costs" and may or may not have caused CDW to lose money on any particular deal.  For example, for a potential deal

with a customer named Realmed, CDW sales employees discussed that they wanted the "5% funding for this opportunity," with "5% below cost" but being "brought back to 5% on the sales side." (Dkt. 295-5, CDWE0161311; Dkt. 295-4, CDWE0181505). On a potential deal with a customer named Midwest, CDW "had no profit" but it still lost to NETech because the customer was more comfortable with NETech's technology. (Dkt. 295-6, CDWE0305515). For Wabash National, CDW used the "5 pt competitive program" which took the deal 5% below cost. (Dkt. 295-19, CDW0305930). This was "the first Wabash deal [CDW] took below cost because we are in a competitive situation with NeTech." (*Id.*).

Even viewing the evidence in the light most favorable to NETech, a jury could not conclude that CDW was engaged in predatory pricing under the applicable standards discussed above. *See, e.g., Cargill,* 479 U.S. at 119 n.15 1986) (predatory pricing claim requires considering whether the defendant has sufficient market power that it can absorb losses over an extended period sufficient to drive others from the market and then charge supracompetitive prices). NETech has offered no evidence—expert or otherwise—about the relevant market, the efficiency of the market, the presence of other competitors in the market, or barriers to entry to the market, all factors that bear on the ability or inability to charge supracompetitive prices. Nor has it presented any evidence that *it* has been or is about to be driven from the market.

Stray comments from salespersons that they want to "destroy the competition" do not suffice to prove that the defendant's pricing behavior and its

market power could threaten the elimination of competitors from the market.  *R.J. Reynolds,* **462 F.3d at 696 ("Instead of proffering evidence about the likely economic effect of [the defendant's] selective discounts, [the plaintiff] wanted to regale a jury with evidence that" its rival wanted to shut it down or kill it; "Businesses need not love their rivals.")**

NETech's evidence that CDW won one customer because of "below cost" pricing falls woefully short of proof of predatory pricing or illegal conduct in any way remotely similar to that proscribed under the antitrust laws, including the pricing behavior found anticompetitive in *Barco.  See Think Tank Software Devel. Corp. v. Chester, Inc.,* **2011 WL 1362527 at \*15 (Ind. Ct. App. April 11, 2011) (unpublished decision) (affirming grant of summary judgment on below-cost unfair competition claim where the evidence failed to show that the defendant had engaged in predatory pricing as illustrated in** *Barco*).

For these reasons, the magistrate judge determines there is insufficient evidence to support NETech's claims for unfair competition and tortious interference with customer relationships based on below-cost predatory pricing.

## Conclusion

For the foregoing reasons, the magistrate judge recommends that the district court GRANT CDW's motion for summary judgment on NETech's remaining counterclaims for tortious interference with business relationships and unfair competition.

The Clerk is directed promptly to mail a copy of this report and recommendation to each party in accordance with Fed. R. Civ. P. 72(a).  Any objections to this report and recommendation must be filed with the court in accordance with Fed. R. Civ. P. 72 and 28 U.S.C. § 636(b)(1) within 14 days of service.  Failure to object will result in waiver of objection or appeal of the issues addressed in this report and recommendation.

Counsel should not anticipate extensions of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Date:   02/07/2013

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

**Distribution:**

All ECF-registered counsel of record via email generated by the court's ECF system